GULF GROUP INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 03–2793 C.

United States Court of Federal Claims.

Filed under seal July 16, 2004.

Reissued, July 30, 2004.[1]

---

true in the case of a misjoinder. *Elmore,* 227 F.3d at 1012.

1. The parties were given an opportunity to propose redactions, and agree that no redactions are

necessary. The opinion is now released to be published in its original form with a minor, non-substantive correction.

Michael A. Gordon, Holmes, Schwartz & Gordon, Rockville, Maryland, for plaintiff. Fran Baskin, Holmes, Schwartz & Gordon, Rockville, Maryland, of Counsel.

Michael D. Panzera, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Deborah A. Bynum, Assistant Director, all of Washington, D.C., for defendant. Donna Ward Black, Department of the Army, Mobile, Alabama, of Counsel.

## OPINION AND ORDER

WOLSKI, Judge.

This post-award bid protest action is before the Court on cross-motions for judgment on the administrative record. Plaintiff Gulf Group protests defendant's award of a contract to another bidder, alleging arbitrary actions concerning its past performance rating and a failure to provide proper notice of the applicability of a suspended provision of the Federal Acquisition Regulations. For the reasons that follow, defendant's motion for judgment on the administrative record is GRANTED and Gulf Group's cross-motion for summary judgment for a preliminary and permanent injunction is DENIED.

## I. BACKGROUND

### A. The Solicitation

On June 9, 2003, the United States Army Corps of Engineers ("Corps") issued Request for Proposal DACA01–03–R–0034 ("the Solicitation"), soliciting proposals for construction work to be performed at MacDill Air Force Base ("AFB") in Florida.[2] The work in question was described as "CONSTRUCT AT/FP GATES," Admin R at 231, with "AT/ FP" standing for "Anti–Terrorist" and "Force Protection." Prospective bidders were given detailed specifications for the work to be performed, including drawings and maps, see Admin R at 431–35, 924–1502, and were asked to provide bids for thirteen separate items composing the "base bid" as well as bids for five additional options. Admin R at 233–34.[3] The work entails improvements to the Port Tampa Gate and the Dale Mabry Gate of the Air Force Base, including the construction of a "Security Forces Building," a visitor's center, two vehicle inspection canopies and an entry gate canopy, three "Overwatch/Guard Post" structures, a new driveway and a traffic circle. Admin R at 256–58.

The proposals were to be judged on a "best value" basis, meaning that the selection entailed a trade-off between cost and quality—or between "price" and "past performance." Bidders were instructed to submit proposals consisting of two parts: a Volume I containing past performance information, and a Volume II, the "Pro Forma," which contained among other things the bid schedule. Admin R at 284–86 (¶ 2.0). The Solicitation contained a provision informing bidders that "past and present performance history will be evaluated on a basis equal to cost or other considerations,"[4] and the methodology of the "performance-price trade-off analysis" was described as follows:

> 7.3 The evaluated Past Performance and price are considered equal. As the assessed risk ratings among the Offerors become less distinct, differences in price between the proposals are of increased importance in determining the most advantageous proposal. Conversely, as differences in price become less distinct, differences in the assessed risk ratings (and the advantages and disadvantages of the risks) between proposals are of increased importance in determining the most advantageous proposal.

---

**2.** This solicitation was subsequently amended on July 3, 2003.

**3.** Options 2 and 4, additional parking at the visitors' center and certain landscaping and irri-

gation at one of the gates, were ultimately chosen. Admin R at 2, 234.

**4.** Admin R at 284 (¶ 1.1).

7.4 The Government reserves the right to award a contract to other than the lowest priced Offeror, if the lowest priced Offeror is other than "Exceptional". In such cases, the Contracting Officer must determine that the higher price is fair and reasonable, and that the past performance advantages of a particular Offeror is worth the difference in price.

Admin R at 297 (§ 120).

Since each bidder was offering to perform the identical work, review of the bid schedules contained in each bidder's Volume II involved very little, if any, subjective analysis or discretion.[5] Discretion instead was employed with regard to the information provided in Volume I of each offer, in performing past performance evaluations to determine the risk rating of each applicant,[6] and then in using this resulting rating to make the performance-price trade-off. The past performance evaluations were performed by a Technical Evaluation Team ("TET"), without knowledge of the bid schedules proposed by any bidders. See Admin R at 30, 292. A provision in the Solicitation specified that the TET would be "composed of representatives from the Using Agency and Corps of Engineers," and the TET included five voting members and three non-scoring members.[7]

The information provided by each bidder in Volume I of its proposal was thus crucial to the TET's ability to evaluate past performance. Bidders were asked to list between five and ten of the "most relevant contracts performed" within the last five years. The meaning of relevance was clearly spelled out:

"Relevant" contracts are construction projects that are similar in scope and magni-

tude to this project, including but not limited to, building construction consisting of concrete foundations, masonry walls, standing seam metal roof systems, associated site utilities, parking, perimeter security, grading, landscaping, demolition/relocation of existing roads and fencing, and in the range of $5,000,000 to $10,000,000.

Admin R at 284 (¶ 2.1.1(a)).

Bidders were instructed to furnish, for each contract listed, information falling in thirteen categories, including "General Scope of Project," "Your Role and Work Your Company Self–Performed," "Extent and Type of Work Subcontracted," and "Performance Evaluation by Owner." *Id.* at 285 (¶ 2.1.1(a)). The Solicitation also contained a parenthetical comment, in bold for emphasis, that **"the attached formats for Company Specialized Experience may be used."** *Id.* at 284 (¶ 2.1.1(a)). This comment referenced a one-page form that included spaces for the information falling in each of the aforementioned thirteen categories. See Admin R at 287. Bidders were told: "The Government will evaluate the quality and extent of Offeror's experience deemed relevant to the requirements of this Solicitation. The Government will use information submitted by the Offeror, as well as other sources, such as other Government agencies or commercial sources, to assess experience." *Id.* at 284 (¶ 2.1.1(a)).

Bidders were further instructed to provide a fully completed "Performance Survey Form" for each of the construction projects listed in their proposal, a blank copy of which was also attached to the Solicitation. *Id.* at

5. Each proposal was scrutinized to ensure that all of the pro forma requirements, such as representations and certifications, bonds, financial statements, and a list of present commitments, were included. Prices were "not rated," but were "evaluated for fairness and reasonableness through the use of price analysis." Admin R at 292 (¶ 2.2.3).

6. In the Solicitation, defendant "reserve[d] the right to verify past and present performance on any projects (whether or not listed by the Offeror) by reviewing the Corps of Engineers Construction Contractor Appraisal Support System (CCASS), or to interview owners or references." Admin R at 293 (¶ 3.4).

7. Gulf Group raised concerns that one of the non-scoring members was a non-governmental employee of the business performing privatized management functions at MacDill AFB under the "A–76 initiative," and in the relief it sought requested that this individual not be included in this Solicitation's TET. However, the Federal Acquisition Regulations specifically provide that government contractors may participate as "technical advisors to a source selection board or ... as voting or nonvoting members of a source evaluation board," as such functions are "generally not considered to be inherently governmental." 48 C.F.R. § 7.503(d)(14) (2003).

285 (¶ 2.1.1(b)), 288–90. Defendant "re-serve[d] the right to verify previous perform-ance by reviewing the Corps of Engineers Construction Contractor Appraisal Support System (CCASS), and/or to interview owners or references," and bidders were assured they "will be afforded the opportunity to reply to or explain adverse performance in-formation." Admin R at 285 (¶ 2.1.1(b)).

The TET was tasked with determining the relevance of the specialized experience sub-mitted by each bidder, reviewing the per-formance evaluations for this experience, and generating a risk rating for each bidder. This process was described as follows:

> The evaluation team will perform a Per-formance Risk Assessment, utilizing the information submitted by the Offeror. The specialized experience information will be evaluated to determine if projects listed are recent, relevant, and of similar scope and magnitude. The past performance in-formation, including but not limited to, completed Performance Survey Forms, reference checks and CCASS ratings, will be used to evaluate the 'quality' of the Offeror's performance on recent, relevant projects of similar scope and magnitude. The purpose of this evaluation is to make an overall assessment of the Offeror's abili-ty to perform the work required by the Solicitation. . . . The assessment repre-sents the evaluation team's judgment of the probability of an Offeror successfully accomplishing the work required by the solicitation, based on the Offeror's demon-strated past performance.

Admin R at 293 (¶ 3.2).

These risk assessments were described in terms of the degree of doubt that a bidder could successfully perform the required work, and spanned six categories, from "Un-satisfactory/No Confidence," in which "ex-treme doubt exists," to "Exceptional/High Confidence," in which "essentially no doubt

exists." Admin R 293–94 (¶ 3.5.1).[8] Two rating categories are involved here—the sec-ond-and third-best. The successful bidder, Kokolakis, was assigned a rating of "Very Good/Significant Confidence," which is de-fined to mean "little doubt exists that the Offeror will successfully perform the re-quired effort." The other five bidders, in-cluding the low bidder, Danner, and plaintiff Gulf Group, were assigned a "Satisfacto-ry/Confidence" rating, defined as meaning "some doubt exists that the Offeror will suc-cessfully perform the required efforts."

Bidders were also informed: "The Govern-ment intends to make award on the basis of initial offers, without discussions. Offerors are therefore cautioned to provide their best terms for both price and past performance submission with their initial offers. . . . Offer-ors may be asked to clarify certain aspects of their proposal (for example, the relevance of past performance information)." Admin R at 296 (¶ 5.1). A definition for "clarification" is also supplied in the Solicitation, as meaning

> limited exchanges, between the Govern-ment and Offerors, that may occur when award without discussions is contemplated. Offeror may be given the opportunity to clarify certain aspects of the proposals (e.g., the relevance of an Offeror's past performance information . . .) or to resolve minor or clerical errors. . . . Clarifications do not require "discussions" or submission of another proposal.

Admin R at 295 (¶ 3.6.3).

The Solicitation also contained a section of "contract clauses" printing in full 117 applica-ble provisions of the Federal Acquisition Regulations ("FAR"). Admin R at 310–421 (§ 700). This section included 48 C.F.R. § 52.219–4, "Notice of Price Evaluation Pref-erence for HUBZone Small Business Con-cerns." Admin R at 329. This provision requires that "[o]ffers will be evaluated by adding a factor of 10 percent to the price of

---

**8.** Although the names of these categories are similar to the performance rating categories that the owners of projects were asked to use in filling out the performance survey forms—unsat-isfactory, marginal, satisfactory, very good, and exceptional—it was expressly noted in the Solici-tation that "the purpose and definitions for use in the evaluation assessment are different." Ad-

min R at 293 (¶ 3.5). This is clear from the emphasis on the amount of "confidence" in the ability of bidders, incorporated in the category names used in the evaluation assessment—no confidence, little confidence, confidence, *etc.*—and from the additional consideration of the "scope and magnitude" of past projects. See Admin R at 293–94 (¶¶ 3.2, 3.5.1).

all offers, except ... [o]therwise successful offers from small business concerns." As the provision was printed verbatim, as required by 48 C.F.R. § 19.1308(b) and § 52.104,[9] it also included the following:

> A concern that is both a HUBZone small business concern and a small disadvantaged business concern will receive the benefit of both the HUBZone small business price evaluation preference and the small disadvantaged business price evaluation adjustment (see FAR clause 52.219–23). Each applicable price evaluation preference or adjustment shall be calculated independently against an offeror's base offer.

> These individual preference amounts shall be added together to arrive at the total evaluated price for that offer.

Admin R at 330 (Solicitation § 700, FAR § 52.219–4).

### B. The Evaluation

The Administrative Record contains the proposals of three bidders: the low bidder (Danner), Admin R at 1513–53; the awardee (Kokolakis), Admin R at 105–52; and the protester (Gulf Group), Admin R at 153–230. Each chose to present its company specialized experience information in a different manner. Danner used the aforementioned "attached formats" from the RFP, see Admin R at 287, but apparently re-typed the formats itself using a word processing program. The number of lines under the item "General Scope of Construction Project" could thus be varied by the bidder. For one of the seven projects listed, Danner expanded this portion to nine lines and provided a fairly detailed description of the work it performed.[10] For the other projects, Danner dedicated just three lines to this portion of the form,[11] and for four of these, merely stated "See Attached Sheet." For six of the seven projects,

Danner provided an attachment containing a picture or pictures and a paragraph or paragraphs explaining the work performed.[12]

Kokolakis, on the other hand, eschewed this format entirely and, for each of the six projects listed, provided a detailed, narrative explanation of the work done on the project, varying in length from one paragraph to one full page.[13] In addition, the "project detail" for each of the six included the name and address of major subcontractors, as well as the owner of the site, the cost, and the construction start and completion dates. Kokolakis also provided a summary sheet that contained the basic information on all six projects—the name and location, the owner, the description of scope, start and completion dates, role (prime contractor), construction cost, and point of contact name and phone numbers. Admin R at 106.

Gulf Group presented its company specialized experience information using the format provided in the Solicitation, see Admin R at 287, apparently photocopying the page from the Solicitation and typing the information for each project using a typewriter.[14] Gulf Group used between two and four of the lines (which were five in total) under the item "General Scope of Construction Project," to describe the work performed. These descriptions were limited to the same terms employed in the Solicitation to describe relevant contracts, and thus were varying combinations of "building construction consisting of concrete foundations, masonry walls, standing seam metal roof systems, associated site utilities, parking, perimeter security, grading, landscaping, demolition/relocation of existing roads and fencing." Compare Admin R at 284 (¶ 2.1.1(a)), with Admin R at 158–68. The repetition of these categories was the only description provided for any of the projects submitted as relevant.

---

9. 48 C.F.R. § 19.1308(b) (2003) mandates that contracting officers "shall insert the clause at 52.219–4 ... in solicitations and contracts for acquisitions conducted using full and open competition." 48 C.F.R. § 52.104(a) (2003) states that contracting officers "must not modify provisions and clauses unless the FAR authorizes their modification."

10. Admin R at 1517.

11. Admin R at 1515, 1518, 1520, 1522, 1524, 1526.

12. Admin R at 1516, 1519, 1521, 1523, 1525, 1527.

13. Admin R at 107–17.

14. Admin R at 159–68.

On July 16, 2003, the day after the deadline for submission of bids, the TET members received the proposals of six bidders, and met to discuss each one. Their thoughts were memorialized in a "Consensus Evaluation Sheet" for each bidder. The sheet for Gulf Group stated that the TET was "seeking the following clarification" from Gulf Group: "Clarification—Offeror needs to clarify that their firm actually performed the scope of work delineated for each of the ten projects." Admin R at 88. The TET's consensus was that Gulf Group be given a "Satisfactory/Confidence" risk rating: "Owners Survey reflected eight Exceptional ratings and two Very Good ratings. Based on the relevancy of projects, Owners Survey results, *and the Government's need for Offeror to clarify certain aspects of their proposal,* the Technical Evaluation Team found that there is some doubt that Offeror will successfully perform the required work." Admin R at 89 (emphasis added).

After the TET determined its risk ratings for each bidder, it was provided the prices submitted by each bidder for the proposed work. The TET performed its performance-price trade-off analysis to determine if a bidder other than the low bidder should be awarded the contract. It found that the better risk rating for Kokolakis justified awarding it the contract instead of the low bidder, Danner, even though the price would be increased by $134,502. The TET's findings were memorialized in a report dated one week later. This report to the Source Selection Authority included TET's explanation of Gulf Group's "Satisfactory/Confidence" rating:

> Gulf Group provided ten projects for review, ranging from $50K to $6.3M. Note that Gulf Group was only a subcontractor on the $6.3M project. Upon first glance of projects, the TET rationalized that Gulf Group demonstrated relevant experience on all ten projects, although projects were not within the required range of our project. However, a more in depth review of the name or type of projects, plus our knowledge of some of the work in comparison with the scope of the work contained on the specialized experience sheet for each project, raised some concerns

among TET members that Gulf Group may have simply just repeated the relevant contract language contained in Section 00110, Paragraph 2.1.1(a) of the solicitation. As a result, the TET concluded that Gulf Group should be required to clarify that their firm actual [sic] performed the scope of work delineated for each project. Based on the relevant experience currently displayed on specialize [sic] experience sheets, the TET determined that there is some doubt that Gulf Group can successfully perform the work, and therefore, assessed the overall risk rating of Satisfactory/Confidence, pending a satisfactory response to the clarification from Offeror.

Admin R at 72 (TET Report (July 23, 2003) ¶ 8).

Although the TET "concluded" that a clarification from Gulf Group was "required," and made its assessment "pending" the company's response to the clarification request, no clarification was sought. The TET stated that its determination was based, in part, on "our knowledge of some of the work," but the Administrative Record as compiled by the Corps did not identify what this knowledge of Gulf's work happened to be. As further explained below, the Court allowed the record to be supplemented with an explanation of this purported "knowledge." Defendant submitted a "statement" that explained that the referenced knowledge of Gulf's work was possessed by only one TET member, Mr. Robert Fisher. Def's Notice of Filing Statement to Supplement the Admin R ("Def's Supp") at 1–2. Mr. Fisher "observed," "participated in discussions about," and "examined the completed work of" three of Gulf's projects at MacDill AFB. *Id.* at 2. These three projects, submitted as company specialized experience, Admin R at 162–64, were identified by Gulf as "Security Fence Installation," "Perimeter Fence Reinforcement," and "Repair Water Lines Basewide." Def's Supp at 2.

Mr. Fisher apparently knew that the first project "did not involve buildings or roads, and involved very little earth moving work." *Id.* Mr. Fisher felt "the complexity of con-

struction methods and requirements and amount of funding involved for this project did not nearly approach the scope and complexity" of the Solicitation. *Id.* at 2–3. The second project "had work requirements similar to those of" the first, and "was much smaller and less complex" than the Solicitation. *Id.* at 3. And Mr. Fisher apparently knew that the third project "involved only a small amount of demolition, and required very little coordination of different business trades." *Id.*

### C. The Selection

One week after receiving the TET report, the Source Selection Authority ("SSA"), a Mr. Edward M. Slana, issued his decision to award the contract to Kokolakis. The Solicitation provided that the SSA was to take this "input" from the TET and "independently exercising prudent business judgment, will make the Source Selection Decision based on the Offeror who proffers the best value to the Government." Admin R at 296 (¶ 6.1). The SSA adopted the TET's "satisfactory/confidence" risk rating for Gulf Group, explaining this evaluation as follows:

> Ten projects were submitted by Gulf Group. In one of them, they were a subcontractor. For the other projects, the TET could not determine what role Gulf Group had in the projects, because it appeared to the TET that they merely repeated the relevant contract language from the Solicitation Section 00110. Without obtaining clarifications from Gulf Group for all the projects, the TET could not ascertain exactly what sort of work they performed to determine the relevancy of the projects. Therefore, the TET determined that there is some doubt that Gulf Group can successfully perform the work, and they were given an overall risk rating of satisfactory/confidence, pending a satisfactory response to the clarifications from the contractor.

Admin R at 27 (Source Selection Decision Document (July 30, 2003) at 3).

The SSA made his decision from among six proposals that had been evaluated by the TET. Of the six, only the successful bidder, J. Kokolakis Contracting, received a risk rating of "very good/significant confidence." The other five, including Gulf Group, received the lower "satisfactory/confidence" rating. Admin R at 26. Among these five was the low bidder, Danner Construction, which offered the price of $7,039,398 to perform the contract plus all options.[15] The TET conducted the performance-price tradeoff analysis between Danner, the low bidder, and Kokolakis, the only bidder in the better risk rating category. Admin R at 73. It "determined that there is justification to pay a higher price of $134,502.00 for Kokolakis, upon consideration of Kokolakis's relevancy of the actual worked [sic] performed on the two [relevant] projects, which involved building construction consisting of concrete foundation, site utilities, perimeter security, grading, landscaping, and other work." *Id.* This contrasted favorably with Danner's experience, which was "primarily demonstrated" to be in "interior renovation." *Id.*

The SSA adopted the TET's trade-off analysis, Admin R at 27–28, and selected Kokolakis for the contract. Neither the TET report nor the SSA decision reference the ten percent HUBZone preference to which Gulf Group was entitled under paragraph 52.219–4 of section 700 of the Solicitation. See Admin R at 329–30. Under this provision, a factor of ten percent was to be added to the price of all offers, with certain exceptions. *Id.* It does not appear to be disputed, however, that Danner was a small business concern and thus was excepted from the ten percent adjustment, under paragraph 52.219–4(b)(ii). See Admin R at 13. If one factors in the HUBZone preference, and adds ten percent to Kokolakis's bid of $7,173,900, then Gulf Group was the second-lowest bidder:[16]

---

**15.** The Solicitation provided that "the Government will evaluate offers for award purposes by adding the total price for all options to the total price for the basic requirement." Admin R at 273 (§ 100, ¶ 52.217–5).

**16.** Without this preference, Gulf Group was the fourth-lowest bidder, following Danner, Kokolakis, and R.M. Williams Contractors, Inc. The record does not indicate whether the latter was a small business concern, and the Court assumes it was not.

Danner:           $7,039,398.00
Gulf Group:       $7,706,388.57
Kokolakis:        $7,891,290.00

It appears that there was no discussion of this preference in the two documents because the trade-off analysis was a decision whether to award the contract to the low bidder or to another bidder with a better past performance rating. The HUBZone preference would not raise the price of the low bidder, because of the small business exception, and thus was irrelevant to the first part of the analysis; and Gulf Group was not in a better risk rating category than Danner, so it did not figure in the second part of the analysis. In a comparison of Kokolakis and Danner, neither of which was a HUBZone small business concern, this preference would not apply to adjust either's bid.

### D. Procedural History

In a letter dated September 12, 2003, the Corps informed Gulf Group that the contract was being awarded to Kokolakis. Admin R at 23. Gulf Group received this letter on September 17, 2003, and filed a protest with the United States General Accounting Office ("GAO") the next day. Admin R at 17–22; see also Complaint ¶ 40. The protest was based on both the Corps's failure to provide Gulf Group with the small disadvantaged business ("SDB") preference, and the past performance rating. *Id.*

In a document filed in the GAO proceeding, the SSA several months after the fact gave a slightly different explanation for the TET's rating, and a reason why no clarifications were sought. After listing the projects submitted as relevant by Gulf Group, identifying these by name and dollar size, the SSA explained:

As shown above, **none** of the eight projects submitted by Gulf Group as a prime contractor were within the **$5,000,000.00 to $10,000,000.00** range stated in the RFP. Also, in TET's evaluations of the "Company Specialized Experience" Sheets, located at TAB J, which accompanied each of these projects, they observed that for almost all the projects, the "general scopes of the construction projects" were **exactly** what was stated in the RFP paragraph [sic] 00110, paragraph 2.1.1(a) referenced

above. In other words, it appeared to the TET that the contractor merely copied the information from the RFP on to [sic] the sheets. A first, it appears that each of the projects submitted was **exactly** similar to the Construct AT/FP project. However, upon further review, the titles of the projects and the associated dollar values didn't appear to match the work items listed. Therefore, since the TET could not ascertain what work Gulf Group actually performed for these projects, they noted these as clarifications in their evaluations, *and had discussions been conducted, these points would have been brought forth to the contractor for clarification.*

Admin R at 12–13 (Contracting Officer's Statement Concerning Protest of Award (Oct 23, 2003) at 4–5) (italics added).

The Corps stayed performance of the contract pending GAO review, pursuant to the Competition in Contracting Act, 31 U.S.C. § 3553(d). Complaint ¶ 40. Gulf Group requested a fact-finding hearing before the GAO, relating to the past performance rating, and this request was denied on December 1, 2003. The next day, Gulf Group wrote to request reconsideration of the decision to not hold a fact-finding hearing. *Id.* ¶ 41. On December 5, 2003, the GAO denied yet again Gulf Group's request for a fact-finding hearing.

Gulf Group filed its Complaint in this Court on December 8, 2003, along with a motion for expedited discovery and a motion for a temporary restraining order ("TRO") or preliminary injunction. The first count of the Complaint alleged that Gulf Group's past performance rating "should have been superior or at least equal to" that of the successful bidder. Complaint ¶¶ 42–47. The second count alleged that SSA lacked a reasonable basis for his failure to obtain the clarification recommended by the TET. *Id.* ¶¶ 48–51. Count III was that the suspension of the SDB preference amounted to a FAR deviation requiring notice, the lack of which prejudiced Gulf Group. *Id.* ¶¶ 52–56. Count IV was a request for injunctive relief, on the basis of "profits, future opportunities, its investment at MacDill AFB, and key personnel" that Gulf Group would lose, and the

costs to the Corps that would result from switching contractors in mid-performance. Complaint ¶¶ 57–60.

A preliminary status conference was held by telephone on December 9, 2003, and a schedule was set for briefing. During this conference, the Corps agreed to refrain from issuing a notice to proceed on the contract until January 15, 2004, and Gulf Group accordingly withdrew its TRO motion as moot. The Court issued a protective order on December 11, 2003. The Corps filed the Administrative Record on December 12, 2003.[17]

Gulf Group filed a renewed motion for expedited discovery on December 15, 2003, and the Corps filed its response on December 19, 2003. Gulf Group sought the production of documents, including drafts, e-mails and all CCASS listings, that related to the evaluation of its, Danner's, and Kokolakis's proposals. It also sought to depose the SSA and TET members. Gulf Group justified the discovery request as relating to the following matters: (1) the Corps's alleged exclusion from consideration of a certain subcontract of Gulf Group's; (2) the "knowledge" of Gulf Group's work that the TET relied upon in its past performance analysis; (3) alleged "disparate treatment" in evaluating the past performance claims of Kokolakis and Gulf Group; and (4) why no clarifications were sought from Gulf Group. Pl's Motion for Expedited Discovery at 9–11.

Bid protests like the present case, brought under the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub.L. No. 104–320, §§ 12(a)-(b), 110 Stat. 3870, 3874 (1996), are decided by this Court according to Administrative Procedure Act ("APA") standards. 28 U.S.C. § 1491(b)(4) (2000) (incorporating 5 U.S.C. § 706). Review of an agency decision under the APA is normally confined to the review of an administrative record compiled by the agency, which is supposed to contain all of the materials relied upon by the agency in making its decision as well as an articulation of this decision. See *Orion Intl. Technologies v. United States,* 60 Fed.Cl 338,

342–43 (2004). This "record" has been called something of a fiction when the decision in question was an informal one, such as a procurement decision. *Id.* at 343 & n. 9. Yet, under normal circumstances even these proceedings yield a record containing all relevant information by the mere assembling of the obvious documents—solicitations, bids, evaluations, reports, and decisions. Nevertheless, supplementation of the record "might be necessary to help explain an agency's decision and thereby facilitate meaningful judicial review," or to add "relevant information that by its very nature would not be found in an agency record" such as "information relied upon but omitted from the paper record." *Id.* at 343–44.

As documents already in the Administrative Record showed that the subcontract that the Corps allegedly ignored *was* considered, the Court did not allow any discovery in this area. The Corps's response to the discovery motion stated that all of the CCASS listings reviewed by the TET and the SSA were already in the record, and given counsel's obligations under Rule 11 of the Rules of the United States Court of Federal Claims ("RCFC"), there was no basis for discovery into that area. See Def's Response In Opp to Pl's Motion for Leave to Conduct Expedited Discovery at 18–20.

Nor did the Court allow discovery of draft documents and internal communications. The record already contained the final determinations of the relevant decisionmakers and the contemporaneous reasons they gave in support of these decisions. See Admin R at 25–61, 70–101. These documents sought by Gulf Group would likely not have contained additional facts or information considered by the Corps, but instead would have reflected the mental thought processes of the decisionmakers, an area into which discovery is normally not allowed in APA-style review. See *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Impresa Construzioni Geom Domenico Garufi v. United States,* 238

---

17. On December 22, 2003, the Corps was permitted to correct the record by adding documents that were inadvertently omitted from the prior filing. These documents were the CCASS reports for the bidders other than Gulf Group and Kokolakis. See Admin R at 55–1–3, 57–1–7, 59–1–5, 95–1–3, 97–1–7, and 99–1–5.

F.3d 1324, 1339 (Fed.Cir.2001). The Court also concluded that if it were determined that the Corps should have sought clarifications from Gulf Group, it is the fact of this failure to seek clarifications, not the reasons for this failure, that would be relevant to Gulf Group's protest. Discovery in all of these areas was denied in an order dated December 22, 2003.

There was one area of inquiry, however, into which discovery was warranted. The TET expressly based its risk rating of Gulf Group, in part, on its "knowledge of some of the work" performed by Gulf Group on past contracts. Admin R at 72. The Court concluded that this unexplained reference demonstrated that the Corps "considered evidence which it failed to include in the record," *Cubic Applications, Inc. v. United States*, 37 Fed.Cl 339, 342 (1997) (quoting *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir.1989)), necessitating discovery to fill this gap. The Corps attempted to brush the referenced "knowledge" aside as merely "the thought process" involved in the decision, Def's Response in Opp'n to Pl's Motion for Leave to Conduct Expedited Discovery at 16–17, but plainly there is a difference between the evaluation of facts and the facts themselves.

Mindful, however, that the Court "must tailor discovery in bid protest cases as narrowly as the context of the procurement allows to fill gaps in the record and explain actions taken," *Emery Worldwide Airlines, Inc. v. United States*, 49 Fed.Cl 211, 219 (2001), the Court believed that the requested depositions were more burdensome than necessary to obtain the missing information. Instead of allowing the discovery requested by Gulf Group, the Court ordered the Corps to provide the following information to Gulf Group, as if it were answering a written interrogatory, on or before December 30, 2003:

Please describe what is meant by the TET's "knowledge of some of the work" performed by plaintiff, as that phrase is used on page [Admin R at 72]. In this description, identify the particular work performed and the contracts under which the work was performed. If this "knowledge" was based on any documents that were reviewed in preparation of the July 23, 2003 report and that are not already contained in the A[dmin]R, please provide plaintiff with a copy of each such document.

*Gulf Group, Inc v. United States*, slip op at 3 (Dec 22, 2003).

Gulf Group moved for reconsideration of the Court's decision to deny its discovery in all other respects, and this motion was denied on January 9, 2004. Gulf Group also moved to supplement the record with several declarations from its president, Mr. Michael Hobbs, Sr., and another exhibit that had been filed with the GAO. This latter exhibit consisted of performance evaluations and letters of commendation for Gulf Group's work performed on three contracts. Memo of Points & Authorities in Support of Motion, Ex C. Gulf Group did not include two of these contracts as examples of its relevant specialized experience, see Admin R at 158–68, but did include a copy of two of these documents as part of the past performance information supporting its proposal. See Admin R at 169, 174, 179.[18] Gulf Group justified including these documents in the record by calling them "the information that would have been obtained by the Corps" had the TET members "reviewed the resources available to them." Pl's Motion to Supplement at 1. But in reviewing an agency's decision, the Court must look at the actual information that was before the agency, see *Overton Park*, 401 U.S. at 420, 91 S.Ct. 814, not what the agency could have discovered had it taken upon itself the job of making the contractor's case for it. To the extent this touches

---

**18.** This particular exhibit includes a list of three projects allegedly performed for the Corps by Gulf Group, not one of which was used as an example of relevant experience. The supporting documents, however, only relate to two of these projects. Instead of performance evaluations for the third project, described as "Sanitary Sewer Rehabilitation" at MacDill AFB, Gulf Group appears to have mistakenly included letters that reference the sub-contract that it proposed as relevant, the "Hydro Pattern Restoration, Area 2" project. Compare Memo of Points & Authorities in Support of Motion, Ex. C, with Admin R at 159, 179.

on matters before a reviewing court, it would be the arbitrary refusal to consider information that was known to an agency that would be relevant, not the information that a bidder failed to bring before the agency. The motion is DENIED as to these documents.

Three declarations of Mr. Hobbs were proposed to supplement the record. Taking these in chronological order, the first was allegedly submitted to the GAO and stated, among other things, "[h]ad I or anyone at Gulf been notified of the deviation from or suspension of the FAR clause giving us the SDB preference, we would have submitted a price 10% lower in order to compete with the large businesses we thought we would be competing with." Memo of Points & Authorities in Support of Motion, Ex I.[19] Since one of the issues in this protest is whether the Corps acted contrary to laws and regulations in not expressly notifying Gulf Group that the SDB preference was suspended, the Court GRANTS the motion to allow this exhibit to supplement the record. Evidence of injury to a bidder-"prejudice" in the parlance of bid protests—due to the failure to follow applicable laws or regulations is relevant information "that by its very nature would not be found in an agency record," *Orion*, 60 Fed.Cl at 344, and thus can be properly added to the record.

The second declaration, prepared for this litigation, contained twenty paragraphs of testimony. Memo of Points & Authorities in Support of Motion, Ex. A. Much of this declaration consisted of Mr. Hobbs's arguments as to why he felt the Corps's evaluation was not performed properly. Three paragraphs were devoted to a summary description of the harm he believed Gulf Group would suffer if contract performance were not enjoined. The final paragraph reiterated his claim that Gulf Group would have reduced its bid by ten percent had it not thought the SDB preference applied.[20] The Court finds that only the three paragraphs relating to the harm Gulf Group alleges it would suffer absent an injunction should be added to the record, for the sole purpose of determining the propriety of injunctive relief.[21] See *PGBA, LLC v. United States*, 57 Fed.Cl 655, 664 (2003) (basing finding of irreparable injury on assertions in affidavits).

The third Hobbs declaration was a "Supplemental Declaration" that was submitted with Gulf Group's cross-motion. This was essentially a rebuttal to the Corps's response to the Court's December 22, 2003 order concerning the TET's knowledge of Gulf Group work. See Pl's Opp'n & Cross–Motion for Summ J, Ex J. This declaration cannot be added to the administrative record. The purpose of the inquiry posed to the agency was to discover what this "knowledge" happened to concern. The response identified the specific projects, as well as what Mr. Fisher knew about them.[22] Gulf Group's motion to supplement the record with the various Hobbs declarations is thus GRANTED–IN–PART and DENIED–IN–PART.

On January 12, 2004, the Court held a hearing on the cross-motions for judgment on the administrative record. At this hearing, Gulf Group moved to add to the record three pages of material downloaded from the Internet that referenced an air show to be held at MacDill AFB in April. These pages were not from a federal government website.

---

**19.** Gulf Group misidentifies this declaration as "Exhibit H" in its motion. See Pl's Motion to Supplement at 1.

**20.** It cannot be necessary for the record to be supplemented with this final paragraph, as the same information was contained in the declaration from the GAO proceedings that the Court added to the record, above. See Memo of Points & Authorities in Support of Motion, Ex I.

**21.** These are paragraph number three and the two paragraphs that are numbered "4." See Memo of Points & Authorities in Support of Motion, Ex A at 1–2.

**22.** This "Supplemental Declaration" does dispute one fact asserted in the Corps's statement, rebutting Mr. Fisher's claim that the "Security Fence Installation" project "did not involve … roads," Def's Supp at 2. But see Memo of Points & Authorities in Support of Motion, Ex J ¶ 3. The Corps's statement is internally inconsistent on the matter of this project's road work, as it also asserts that "Mr. Fisher personally did not have any doubt that Gulf Group in fact performed the work detailed in their specialized experience forms." Def's Supp at 3. The Court does not give any credence to Mr. Fisher's other assertion concerning the project's lack of road work, and thus rebuttal is unnecessary.

The Court denied the motion but took judicial notice of the fact that this air show was scheduled, for the limited purpose of balancing the respective harms in determining whether injunctive relief was warranted.[23] Three days after the hearing, the Court issued an order denying Gulf Group's motion and granting the Corps's motion.[24] This opinion explains that decision.

## II. DISCUSSION

### A. Standard of Review in a Bid Protest Case

Post-award bid protests are heard by this Court under the Tucker Act, as amended by the ADRA. This provision requires our court to follow the APA standards of review: "In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5." 28 USC § 1491(b)(4). The Supreme Court had determined, long before the 1996 enactment of the ADRA, how it expects lower courts to conduct APA review of informal agency decisions. The Court in *Overton Park* held that the de novo review standard contained in 5 USC § 706(2)(F) does not usually apply in such circumstances, 401 U.S. at 415, 91 S.Ct. 814.[25] Instead, courts are to employ the standard of 5 USC § 706(2)(A): whether the agency's acts were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See *Overton Park,* 401 U.S. at 416, 91 S.Ct. 814; see also *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). The "fo-

cal point for judicial review should be the administrative record already in existence," *id.,* and this applies even where, as here, the matter being reviewed was not the product of a formal hearing. See *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985).

A motion for judgment on the administrative record, under RCFC 56.1, differs from a motion for summary judgment under RCFC 56. See, e.g., *Tech Systems, Inc. v. United States,* 50 Fed.Cl 216, 222 (2001). Summary judgment may be granted only if "there is no genuine issue as to any material fact," RCFC 56(c). This requirement is omitted from RCFC 56.1, which expressly incorporates the standards of RCFC 56(a)-(b), but not RCFC 56(c). See RCFC 56.1(a). The omission of the undisputed facts requirement from the judgment on the record procedures appears to be the result of two factors. First, as explained above, APA review is usually based on a paper record, not live testimony. Second, the fact-finder in cases before our Court is the Court itself, not a jury. If the only relevant facts are those contained in an administrative record already compiled, and if any disputes as to those facts are to be resolved by the Court, it would be senseless to deny judgment on the record based on facts in dispute—as the resulting "trial" would consist of the very same facts from the very same record being determined by the very same judge.

This is not to say that a trial based on live testimony, or even on papers submitted to supplement the record, will never be permit-

---

**23.** See Tr at 114 lines 6–13 (Jan 12, 2004).

**24.** Gulf Group filed a "Motion for Reconsideration or for Stay Pending Appeal" on January 20, 2004. This motion was withdrawn on January 30, 2004.

**25.** Unlike the "substantial evidence" review standard, which contains express statutory text restricting its applicability, see 5 U.S.C. § 706(2)(E) (2000), the de novo review provision merely states that it applies "to the extent that the facts are subject to trial de novo by the reviewing court." 5 U.S.C. § 706(2)(F). The *Overton Park* court looked to legislative history for guidance. See 401 U.S. at 415, 91 S.Ct. 814 (citing Administrative Procedure Act, HR Rep No 1980, 79th Cong, 2d Sess (1946)). But the House report cited by the Court contradicts the Court's conclusions, and said of the de novo

provision: "It would also require the judicial determination of facts in connection with rule making *or any other conceivable form of agency action* to the extent that the facts were relevant to any pertinent issues of law presented." HR Rep No 1980 at 45 (emphasis added); *id.* at 46 (stating "facts necessary to the determination of any relevant questions of law must be determined by record somewhere and, *if Congress has not provided that an agency shall do so, then the record must be made in court*") (emphasis added); see also 92 Cong Rec 5654–55 (May 24, 1946) (statement of Rep. Walter) ("Where there is no statutory administrative hearing to which review is confined, the facts pertinent to any relevant question of law must of course be tried and determined de novo by the reviewing court.").

ted in a bid protest under any circumstances.[26] Indeed, before the passage of the ADRA, it was not uncommon for courts to go beyond the administrative record in making factual determinations in bid protest cases. See *Mike Hooks, Inc. v. United States*, 39 Fed.Cl 147, 155 (1997) (collecting cases). But given the nature of "arbitrary and capricious" review, discussed below, it will be rare for the Court to determine that disputed facts outside the record are material to the resolution of a bid protest.

Under the "arbitrary and capricious" or "abuse of discretion" standard of review,

> the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Overton Park*, 401 U.S. at 416, 91 S.Ct. 814 (citations omitted). The Court will look to see if an agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), and "may not supply a reasoned basis for the agency's action that the agency itself has not given," *id.* In other words, the reviewing court must determine whether "the procurement official's decision lacked a rational basis," *Impresa Construzioni*, 238 F.3d at 1332 (adopting APA standards developed by D.C. Circuit); see also *Delta Data Systems Corp. v. Webster*, 744 F.2d 197, 204 (D.C.Cir.1984).

Because of the deference courts will accord to discretionary procurement decisions, "the disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" *Impresa Construzioni*, 238 F.3d at 1333 (quoting *Saratoga Development Corp. v. United States*, 21 F.3d 445, 456 (D.C.Cir.1994)). And in cases such as this, when a negotiated procurement is involved and at issue is a performance evaluation, the greatest deference possible is given to the agency—what our Court has called a "triple whammy of deference." *Overstreet Electric Co. v. United States*, 59 Fed.Cl 99, 117 (2003) (citing the deference to agency decisions under *Information Technology & Appl'ns Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir.2003); the greater deference under *LaBarge Products, Inc. v. West*, 46 F.3d 1547, 1555 (Fed.Cir.1995) and *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 958 (Fed. Cir.1993); and even greater deference under *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed.Cir.1996)); see also *id.* at 102 (characterizing the standard of review as "near draconian"); *id.* at 108. In a bid protest involving performance standards, "procurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss Co.*, 77 F.3d at 449 (citing *Lockheed*, 4 F.3d at 958). The presence (by the government) or absence (by the protester) of any rational basis for the agency decision must be demonstrated by a preponderance of the evidence. See *Overstreet*, 59 Fed.Cl at 117; *Information Technology & Appl'ns Corp. v. U.S.*, 51 Fed.Cl 340, 346 (2001) (citing *GraphicData LLC v. United States*, 37 Fed.Cl 771, 779 (1997)), affd, 316 F.3d 1312 (Fed.Cir.2003).

An additional ground for a contract award to be set aside is when the protester can show that "the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni*, 238 F.3d at 1332.[27] This showing must be of a "clear and

---

**26.** See, e.g., *Alfa Laval Separation, Inc. v. United States*, 40 Fed.Cl 215, 219–20 & n. 4 (1998) (parties agreed to a trial with testimony supplementing the administrative record), revd on other grounds, 175 F.3d 1365, 1368 (Fed.Cir.1999); *GraphicData, LLC v. United States*, 37 Fed.Cl 771, 779–81 (1997) (summary judgment standard applicable because of record supplementation); *MVM, Inc. v. United States*, 46 Fed.Cl 137, 140 (2000) (holding a "paper trial" based on expert testimony to determine issue of prejudice to protester).

**27.** It is not clear whether this standard comes from 5 U.S.C. § 706(2)(A), as being "otherwise not in accordance with law," or under 5 U.S.C. § 706(2)(D), as an example of an action taken "without observance of procedure required by law." Presumably, 5 U.S.C. § 706(2)(B)-(D) are mere elaborations on the 5 U.S.C. § 706(2)(A) theme, and thus apply in all bid protests.

prejudicial violation of applicable statutes or regulations." *Id.* at 1333 (quoting *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973)).

Gulf Group has requested permanent injunctive relief, the standard for which is the same as for preliminary injunctive relief, except that actual success on the merits replaces the likelihood of success factor. See *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Thus, to obtain injunctive relief, a bid protester must demonstrate that:

(1) it actually prevailed on the merits of its underlying claim;

(2) it will suffer irreparable injury if this court does not grant an injunction;

(3) the harm it will suffer if the injunction is not issued outweighs the harm to the United States and third parties; and

(4) granting the injunction does not harm the public interest.

*Overstreet,* 59 Fed.Cl at 109 (citations omitted).

## B. Was Gulf Group Prejudiced by the Challenged Actions?

■ Before reaching the merits, a threshold question that must be addressed is whether the bid protester was prejudiced by the decisions it challenges. *Info Tech,* 316 F.3d at 1319. This question comes first because the standing of disappointed bidders turns on it. *Id.* To determine prejudice, the court must determine whether there was a "substantial chance," *id.,* or a "reasonable likelihood" that the bid protester would have been awarded the contract but for the allegedly improper actions. See also *Data General Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed. Cir.1996).

■ As recounted above, the unusual manner in which the HUBZone price adjustment, the bids offered, and the past performance ratings interact make the question of prejudice a difficult one. The low bidder, Danner, made a bid of $7,039,398 and was given a "Satisfactory" risk rating. The successful bidder, Kokolakis, made a bid of $7,173,900, and was given a "Very Good" risk rating. The protester, Gulf Group, made a bid of $7,706,388.57, and was placed in the "Satisfactory" risk category. The HUBZone preference would add 10 percent to the bid of Kokolakis for purposes of comparison with Gulf Group, but not for comparison with Danner; and Danner, being a small business, would not have its bid adjusted even in comparison with Gulf Group.

Thus, Gulf Group's bid was lower than Kokolakis's adjusted bid of $7,891,290, but much higher than Danner's bid. Were the allegations of Gulf Group's complaint merely that Gulf Group should have been given a "Very Good" rating equal to Kokolakis, then there would be no prejudice to Gulf Group, for this is not a game of "rock, paper, scissors," but a best value contract solicitation.[28] The determination made by the government was whether to award a contract to a company other than the lowest bidder, and thus the

---

**28.** In "rock, paper, scissors," only two of three options will factor into any decision. Thus, even if Danner could be preferred to Gulf Group because its price was $666,990.57 lower than Gulf Group's—the Court notes there is nothing in the record to indicate whether the superior risk rating was or was not worth this premium—Gulf Group with a "Very Good" risk rating would still win a head-to-head matchup with Kokolakis, because its price is lower than the HUBZone-adjusted price of Kokolakis by $184,901.43. The Corps determined that Kokolakis is preferred to Danner because the "Very Good" rating is worth at least a $134,502 premium. The outcome could turn on which two are being compared; hence, the "rock, paper, scissors" analogy. In this game, two participants start with raised fists and after the count of three lower the raised hand, either maintaining the fist ("rock"), open-

ing the flat palm ("paper"), or extending two fingers ("scissors"). As all schoolchildren once knew, rock beat scissors (by "crushing" or "blunting" them), scissors beat paper (by "cutting" it), and paper beat rock (by "covering" it). This game was also once commonly known as Rochambeau, named after the French Count and General who assisted Washington in the Revolutionary War and whose statue is located across Lafayette Park from this Court. See 10 The New Encyclopædia Britannica 117 (15th ed 2003). Those with advanced course work in economics or political science may recognize this as a variant of Arrow's impossibility theorem. See J. Buchanan, "Social Choice, Democracy, and Free Markets," reprinted in *The Logical Foundations of Constitutional Liberty* 95–7 (Liberty Fund 1999).

calculation was whether obtaining a better risk-rated contractor was worth the higher price.[29] The spread between each higher-priced, higher-rated bidder and the low bidder was the relevant consideration, not the comparison of the prices of the two higher-rated bidders. Under this analysis, even if the SSA would have determined that it was advantageous to the government to pay $666,990.57 more to have the higher-rated Gulf Group perform the contract, it would have still been more advantageous to pay only $134,502 extra for the same rating and award the contract to Kokolakis. Gulf Group not being the low bidder, the comparison between its price and Kokolakis's HUBZone adjusted price would not come into play.

Gulf Group's complaint, however, is not merely that it should have had the same risk rating as Kokolakis. Gulf Group alleges that, but for arbitrary evaluations of its past performance, it could have had the best risk rating of "Exceptional." See Complaint ¶¶ 4, 43–47, 51. It also alleges disparate treatment in the determination of the risk rating of Kokolakis, due to purported, overlooked deficiencies in Kokolakis's application. See Complaint ¶¶ 5, 33; Pl's Opp'n & Cross–Motion for Summ J at 2, 5, 22–3. In addition, Gulf Group alleges that the failure to receive proper notice of the suspension of the small disadvantaged businesses ("SDB") price evaluation adjustment induced it to place a higher bid than it would have. Taking all of these allegations into account, although the court finds it a close question, the conclusion is that Gulf Group would have had a substantial chance to have been awarded the contract either had it been in a better risk category than Kokolakis or had it submitted a bid that was ten percent lower than the one it actually submitted. Thus, for purposes of standing, prejudice has been established.

## C. Gulf Group's Allegations

Gulf Group's complaint consists of three substantive counts, and a fourth count for injunctive relief. Gulf Group alleges in the first count that there was no rational basis for the determination that "some doubt exist[ed]" that Gulf Group could successfully perform the contract. Subsumed in this allegation is the claim that the Corps disparately treated Gulf Group relative to Kokolakis, in insisting that every detail requested by the Solicitation be provided. The second count is the allegation that the decision not to seek clarification of Gulf Group's past performance was itself an abuse of discretion. Gulf Group's third count, which it raises in the alternative, is that the Corps was required to provide notice that the SDB preference was not a part of the evaluation process, and that the lack of such notice induced Gulf Group to increase its bid price by ten percent. Each of these counts will be reviewed in detail below.

### 1. Was the Corps's risk rating evaluation of Gulf Group arbitrary and capricious?

As explained above, the role of the Court in the review of a bid protest is not to second-guess the judgment of the government decisionmakers. As long as these individuals considered the relevant factors and information and articulated a reason for their decision that is not clearly erroneous, the Court will defer to the judgment of the Executive branch. See, e.g., *Overton Park*, 401 U.S. at 416, 91 S.Ct. 814; *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856; *Impresa Construzioni*, 238 F.3d at 1332–33. This deference is at its greatest when the decision under review is a performance evaluation for a negotiated procurement. See *E.W. Bliss Co.*, 77 F.3d at 449; *Overstreet*, 59 Fed.Cl at 102, 108, 117.

Unfortunately for Gulf Group, this is the very situation it finds itself in, having to carry the "heavy burden" of showing no rational basis for a "best value" decision made with "substantial discretion." *Impresa Construzioni*, 238 F.3d at 1333; *E.W. Bliss*, 77 F.3d at 449. The TET reviewed and evaluated the offers of the six bidders submitting complete proposals. Admin R at 70. The Solicitation expressly stated the manner in which this "quality evaluation" or "Perform-

---

**29.** See Admin R at 297 (Solicitation § 120, ¶ 7.4) (stating a "right to award contract to other than the lowest priced Offeror" if "the past perform-ance advantages of a particular Offeror is [sic] worth the difference in price").

ance Risk Assessment" was to be made. First, the TET would evaluate the "specialized experience information"—the descriptive information submitted by each bidder to demonstrate work on similar projects—to "determine if projects listed are recent, relevant, and of similar scope and magnitude." Admin R at 293 (¶ 3.2). The TET would then review the past performance information—customer survey forms, CCASS ratings, and reference checks—to "evaluate the 'quality' of the Offeror's performance on recent, relevant projects of similar scope and magnitude." *Id.* The TET could then reach a "judgment of the probability of an Offeror successfully accomplishing the work required by the solicitation." *Id.*

There is no dispute over whether any of the contracts that Gulf Group identified as demonstrating its specialized experience met the criterion of being "recent." All ten of the projects were performed within five years of the Solicitation. See Admin R at 159–68, 284. At issue, instead, is whether the projects met the relevance and "scope and magnitude" criteria. Relevant contracts were defined as "construction projects that are *similar in scope and magnitude to this project, including but not limited to, building construction* consisting of concrete foundations, masonry walls, standing seam metal roof systems, associated site utilities, parking, perimeter security, grading, landscaping, demolition/relocation of existing roads and fencing, and *in the range of $5,000,000 to $10,000,000.*" Admin R at 284 (¶ 2.1.1(a)) (emphasis added). Under this definition, to be relevant, a construction project has to be "similar in scope and magnitude" to the work solicited by the Corps—namely, the construction of the AT/FP gates. Bidders were expressly informed that the Corps "will evaluate the quality and extent of Offeror's experience deemed relevant to the requirements of this Solicitation." *Id.* The Solicitation lists examples of work that could compose a similar scope to the AT/FP gates construction, and also a range that could demonstrate a

similar magnitude, but is careful to indicate that relevance is not strictly limited to these enumerations.

The scope and magnitude of past experience were vital to the evaluation process not just as the very essence of a relevant project, but also as indicia of a bidder's ability to perform the work under the Solicitation. Thus, the charge to the TET stresses the importance of these factors by not merely subsuming them under "relevance": The TET must "determine if projects listed are recent, relevant, *and of similar scope and magnitude.*" Admin R at 293 (¶ 3.2) (emphasis added).

After reviewing Gulf Group's submission, the TET concluded that "there is some doubt that Gulf Group can successfully perform the work," and the corresponding risk rating of "Satisfactory/Confidence" was assigned. Admin R at 72 (¶ 8). There were two reasons given by the TET for this conclusion. First, it recognized that many of Gulf Group's listed "projects were not within the required range of our project." *Id.* As explained above, this "required range" is not strictly limited to the $5 million to $10 million size identified in the Solicitation, as the Solicitation stated that relevant contracts "includ[ed] but [were] not limited to" such projects. See Admin R at 284 (¶ 2.1.1(a)). But it was for the TET to determine whether contracts were of a similar magnitude to the AT/FP gates project. It could not be said that this conclusion was clearly erroneous, given that only one of Gulf Group's ten submissions fell within the $5 million to $10 million dollar range illustrating relevance. See Admin R at 159 (a $6.3 million subcontract); *id.* at 160–68 (nine projects listed in descending order of size, from $3.02 million to $50,000). The rationality of this conclusion is further confirmed by the fact that the six offers submitted for the contract all were between $7 million and $9 million, and the Corps's estimate of the cost of the work was approximately $6.5 million. See Admin R at 26.[30]

30. Gulf Group argues that the Corps should have aggregated all of the separate projects Gulf Group performed at MacDill AFB in order to come up with experience that is similar in magnitude to the requirements of the Solicitation.

But the seven MacDill projects listed by Gulf Group only total $3,239,500 combined. See Admin R at 162–68. To get above $5 million requires the addition of an eighth project that Gulf Group did not even submit, but was discovered

The second reason given by the TET was that Gulf Group failed to demonstrate that its specialized experience was of a similar scope to that required by the Solicitation. See *id.* at 72 (¶ 8). The TET provided a detailed explanation of its reasoning on this point. It explained that "[u]pon first glance ... Gulf Group demonstrated relevant experience on all ten projects." *Id.* But "a more in depth review of the name or type of projects, plus [the TET's] knowledge of some of the work in comparison with the scope of the work contained on the specialized experience sheet for each project, raised some concerns among TET members that Gulf Group may have simply just repeated the relevant contract language." *Id.*

This second concern focused on the *scope* of the work performed by Gulf Group, as opposed to the magnitude. It is plain from the Solicitation that "scope" refers to the variety and combination of tasks to be performed. See Admin R at 284 (¶ 2.1.1(a)). The problem that the TET had with Gulf Group's submission in this regard was that the only descriptions given for the specialized work experience were combinations of the tasks from the list in the Solicitation illustrating relevant projects. Thus, the TET had merely Gulf Group's representation that projects with short and sometimes cryptic names (such as "Estex Flume," Admin R at 160, or "Ding Darling Wildlife Refuge," *id.* at 161) were of a scope involving the same work listed to illustrate relevance (such as "Associated site utilities; Parking; Perimeter security; Grading; Demolition/Relocation of existing roads and fencing," Admin R at 161). As the exact nature of the work performed by Gulf Group cannot be determined from the names of the projects and these strings of general tasks, the TET's conclusion is hardly irrational.

As mentioned above, the TET's "knowledge of some of the work" performed by Gulf Group was non-voting member Mr. Fisher's

familiarity with three of the MacDill projects. See Def's Supp at 2–4. These three projects were unquestionably smaller in magnitude than the work to be performed under the Solicitation—they ranged from $600,000 to $989,350. Admin R at 162–64. In Mr. Fisher's estimation, these projects were "much smaller and less complex" than the work for the contract at issue in this case, and one in particular "required very little coordination of business trades." Def's Supp at 3. He contrasted this experience with the work required by the Solicitation, which "requires coordination of the many business trades" involved and "requires a contractor with a proven record of success with large complex construction projects." *Id.* at 4. These observations are consistent with the TET's determination that Gulf Group failed to demonstrate experience of a similar scope to that required by the Solicitation. It would have been rational for this determination to have been based solely on the size of the projects submitted as Gulf Group's specialized experience, see *Maintenance Engineers v. United States*, 50 Fed.Cl 399, 415–16 (2001), but Mr. Fisher's observations further bolster the conclusion.

Gulf Group argues that nothing about the names of their listed projects or the description of their scopes of work should have caused the TET to have some doubt that they could successfully perform the work. But the TET was concerned that Gulf Group "simply just repeated the relevant contract language" describing some of the tasks that, when done for a project, could be relevant experience. Admin R at 72 (¶ 8). Gulf Group's argument boils down to the assertion that if it lists a combination of these categories of work from the relevance definition to describe a project, it is then automatically entitled to a determination that the proffered project is relevant. This would usurp the role of the TET in evaluating the specialized experience, and convert the TET into a rub-

---

by the Corps in a CCASS search. See Admin R at 50. In any event, it was not clearly erroneous for the Corps to have treated these eight separate projects, performed over different periods of time (no more than four being worked on contemporaneously), as exactly what they were—separate projects. Unlike *Seattle Security Services, Inc. v.*

*United States,* 45 Fed.Cl 560, 567–69 (2000), the Solicitation at issue is *not* a combination of these projects previously performed by the unsuccessful bidder. It is neither unreasonable nor arbitrary to decide not to combine unrelated projects.

berstamp. The TET did not mechanically base its relevance determination on the words used by a bidder to describe a project, but rather used judgment—judgment which is to receive great deference from this Court. See *E.W. Bliss Co.*, 77 F.3d at 449.

The exercise of this judgment is illustrated by the Corps's treatment of the other proposals in the record. One Kokolakis project submitted to demonstrate specialized experience was the "Dining Facility" built at Mac-Dill AFB. See Admin R at 115. At a cost exceeding $4.5 million, this project was several times larger than any of the MacDill work experience submitted by Gulf Group. See Admin R at 162–68. From Kokolakis's description of the project, this building construction apparently involved a concrete foundation, masonry walls, a standing seam metal roof, and site utilities. Admin R at 115.[31] Had Kokolakis merely listed these work categories, under Gulf Group's approach to evaluating specialized experience it would have been entitled to a determination that the project was relevant. Yet the project was determined to be only somewhat relevant, as the TET was able to evaluate a detailed description of the actual work involved. See Admin R at 72 (¶ 10).[32]

Similarly, Danner submitted as relevant specialized experience the project to "Repair Enlisted Club, Building 499," also at MacDill AFB. Admin R at 1518. This project's cost was nearly $1.7 million, much larger than the MacDill projects submitted by Gulf Group. Compare *id.*, with Admin R at 162–68. From the description, it appears that this project included a standing seam metal roof, masonry, landscaping, a concrete slab, and site utilities. See Admin R at 1518–19. Yet,

because a detailed description of the work—including a picture—was submitted, the TET was able to determine that the project was only "somewhat relevant," despite the number of elements involved that could have been lifted verbatim from the Solicitation. See Admin R at 72 (¶ 9).[33]

Thus, it cannot be said that the TET acted arbitrarily in deciding that it could not determine the scope of the work performed by Gulf Group when the latter "may have simply just repeated the relevant contract language" to describe its experience. Admin R at 72 (¶ 8). The TET nevertheless gave Gulf Group some credit for these projects and, "[b]ased on the relevant experience currently displayed," assigned it a risk rating of "Satisfactory/Confidence," pending clarification. *Id.* This determination is not clearly erroneous based on the record. Only one of the ten projects submitted was within the $5 million to $10 million range illustrating work of a similar magnitude, and the scope of this project—like the other nine—could not be determined based on the lack of a detailed description. See Admin R at 159. The SSA accepted the recommendation of the TET, see Admin R at 25–28, and explained "the TET could not ascertain exactly what *sort of work* [Gulf Group] performed to determine the relevancy of the projects" submitted by Gulf Group, *id.* at 27 (emphasis added). The SSA subsequently reiterated that the magnitude of the projects submitted by Gulf Group, and the fact that "the TET could not ascertain what work Gulf Group actually performed for these projects," were the reasons that "some doubt" existed as to Gulf Group's ability to perform the contract at issue. Admin R at 12–13.[34] Given the great deference

31. The CCASS listing for this project indicates that it also included landscaping and paved parking. See Admin R at 47.

32. See also Admin R at 107 (an $8.2 million project deemed "somewhat relevant" that included demolition, a concrete foundation, and site utilities).

33. See also Admin R at 1520–21 (a "somewhat relevant" project that included demolition, masonry walls, concrete pavement, landscaping, and site utilities); *id.* at 1524–25 (a $4.5 million "somewhat relevant" building construction project at MacDill AFB involving demolition, con-

crete and masonry, a metal standing seam roof, and site utilities).

34. Gulf Group characterizes this statement of the SSA, submitted for the GAO proceeding, as a "post-hoc rationalization" and urges that it not be considered a part of the record. Gulf Group itself, however, sought "post hoc" explanations from the SSA and the TET in moving to depose these individuals. In any event, this explanation was provided by the decisionmaker himself, and while fuller it is not inconsistent with his Decision Document, see Admin R 25–28, in contrast to the testimony at issue in *Lion Raisins, Inc. v. United States*, 51 Fed.Cl. 238, 245 (2001).

the Court must give to such determinations, where "the minutiae of the procurement process in such matters as technical ratings ... involve discretionary determinations of procurement officials that a court will not second guess," *E.W. Bliss Co.*, 77 F.3d at 449, the record establishes that Gulf Group's risk rating was not reached in an arbitrary and capricious manner.

*2. Did the Corps disparately treat the proposals of Kokolakis and Gulf Group in making its risk rating evaluations?*

■ Gulf Group comes at the issue of its risk rating from another angle, alleging that it was the victim of disparate treatment. Pl's Opp'n & Cross–Motion for Summ J at 22–24. It argues that Kokolakis was not held to the same strict standard regarding its past performance submission, with discrepancies or omissions overlooked by the Corps. *Id.* at 22–23. As will be evident below, this argument deals exclusively with the very "minutiae of the procurement process" that is left to the discretion of Executive branch officials and is not to be second-guessed by the courts. See *E.W. Bliss Co.*, 77 F.3d at 449.

Gulf Group points out that, in providing information on the "extent and type of work subcontracted," see Admin R at 285, Kokolakis failed to employ dollar amounts or percentages in its specialized experience representations. See Admin R at 108–16. Such quantification is not an express requirement of the Solicitation, however. See *id.* at 285, 287.[35] For each of the projects it submitted to demonstrate specialized experience, Kokolakis provided a narrative description of the

work involved,[36] identified the major subcontractors,[37] and either listed the work it self-performed,[38] or listed the work performed by the subcontractors.[39] In addition to this information, the TET reviewed CCASS reports for two of the six projects, which expressed the subcontracting work in percentage terms. See Admin R at 39, 47.[40] The TET apparently believed that the subcontracting information presented in this manner was sufficient to allow it to determine the risk of Kokolakis's non-performance. The TET, based on the descriptions of, and performance surveys for, two relevant and two somewhat relevant projects, concluded there was "little doubt" that Kokolakis could perform the work, and gave it a "Very Good/Significant Confidence" risk rating. Admin R at 72–73 (¶ 10). Courts are hardly in a position to say that there was not enough information concerning the "extent" of Kokolakis's subcontracting work for the TET to have rendered a performance evaluation. Such a determination would require the Court to find that the absence of dollar figures or percentages connected with the subcontracting on four of six projects is as disabling to the TET evaluation as was Gulf Group's failure to provide a detailed description of work performed. This sort of second-guessing is not proper for a reviewing Court, particularly given the "triple whammy of deference" that performance evaluations done in the course of a negotiated procurement deserve. *Overstreet*, 59 Fed.Cl at 117; see also *E.W. Bliss*, 77 F.3d at 449.

Gulf Group also makes note of a discrepancy in the record concerning the performance

**35.** Gulf Group argues that the CCASS reports show that "extent" means percentage of work, citing Admin R 43. But several of the CCASS reports do not have percentages associated with the information in the "type and extent of subcontracting" box. See Admin R at 57–6, 59–3, 59–5.

**36.** See Admin R at 107, 109, 111, 113, 115, 116.

**37.** See Admin R at 108, 109, 111, 113, 115, 116.

**38.** See Admin R at 111, 114–16.

**39.** See Admin R at 108–09.

**40.** Gulf Group also claimed that the Corps selectively reviewed CCASS listings, ignoring one allegedly favorable to it, and failing to acknowl-

edge listings for the other bidders other than for projects submitted as specialized experience. Pl's Opp'n & Cross–Motion for Summ J at 24. The record contains CCASS listings for five of the six bidders. See Admin R at 37–47, 50–53, 55–1–55–3, 57–1–57–7, 59–1–59–5. As discussed above, Gulf Group had no support for its claim that the record omitted any CCASS listings reviewed by the TET and SSA. Under the presumption of regularity and good faith conduct—the historic rationale for which, admittedly, hardly fits it for service in bid protest cases, see *Orion*, 60 Fed.Cl at 344 n. 14—the Court must presume that the CCASS search and the compilation of the record were done properly, absent evidence to the contrary.

rating for one of the Kokolakis projects deemed "somewhat relevant," the MacDill "Dining Facility." See Admin R at 115. The performance survey form for this project that was submitted with the proposal gave an overall rating of "Exceptional," based on exceptional item ratings across-the-board. See Admin R at 129–31. The CCASS report for this project was retrieved by the TET and placed in the record. See *id.* at 45–47. Presumably, the TET was acting under its "right to verify previous performance by reviewing" CCASS records. See Admin R at 285 (¶ 2.1.1(b)). The CCASS report, however, was filled out by a different engineer at MacDill than the one who signed the performance survey form, and showed an overall performance rating of "above average," based on mostly "satisfactory" and "above average" ratings for individual items. Admin R at 45–47. The TET stated that this project received an "Exceptional" rating, and made no mention of the information contained in the CCASS report. *Id.* at 72 (¶ 10). The Court notes that the individual items of performance evaluated using the two different forms differ, and that it appears that six of the twenty areas being graded under the Solicitation's "Performance Survey Form" have no clear counterpart in the CCASS report.[41] Thus, an "above average" grade under one regime is not necessarily inconsistent with an "exceptional" grade under the other.

Even if the TET made a mistake in overlooking the different grade, however, it cannot be said that the TET clearly erred in assigning a "Very Good/Significant Confidence" risk rating to Kokolakis in light of this mistake. Rather, this appears to be of the variety of "small or immaterial errors" that are not sufficient to invalidate a procurement decision, *Lockheed,* 4 F.3d at 960. See also *Grumman Data Systems Corp. v. Widnall,* 15 F.3d 1044, 1048 (Fed.Cir.1994). If the rating of the "Dining Facility" project

were considered to be "very good" instead of "exceptional"—"very good" being the rating which corresponds to the CCASS grade of "above average"—the record still supports the TET's risk rating determination. Kokolakis's specialized experience would have been as follows: two relevant projects, the largest of which was graded as "exceptional" and the other "very good;" and two somewhat relevant projects, the largest of which was graded as "exceptional" and the other (the "Dining Facility") "very good." This is consistent with the TET's conclusion that Kokolakis's risk rating should be "Very Good/Significant Confidence."

Gulf Group also disputes the TET's description of the two "relevant" Kokolakis projects as including "perimeter security,"[42] as these exact words are not found in the descriptions of the work. See Admin R at 111, 113. The first project, however, involved construction of housing at MacDill AFB, and may well have had the same security needs as the AT/FP gates project. See Admin R at 111.[43] And the second project description stated the facility being reconstructed "was monitored with state-of-the-art tilt-zoom cameras" and that "[i]ngress and egress to all areas of the facility was monitored with a card access system." Admin R at 113. The TET's conclusion that these projects involved "perimeter security" was thus not clearly erroneous, and would have been a de minimis error at worst.

As recounted above, Gulf Group's disparate treatment allegations not only seek to have this Court over-step its bounds and second-guess decisions involving the minutiae of the evaluation process, but they also fail to demonstrate that the TET acted arbitrarily and capriciously. Further, even if Kokolakis were given the lower rating of "Satisfactory/Confidence" that was given to all of the other bidders, this would still not entitle Gulf Group to a judgment in its favor. If all risk

---

**41.** These are items numbered 3, 4, 9–11, and 17. Compare Admin R at 289, with *id.* at 46–47. Of the fourteen items for which there is an apparent CCASS counterpart, Kokolakis received four satisfactory, six above average, and four outstanding scores on the CCASS report for the "Dining Facility" project. See *id.*

**42.** See Pl's Proposed Additional Fact No. 17.

**43.** Gulf Group also incorrectly states that Kokolakis did not describe its own role in the "somewhat relevant" project "Hoffman Press Box," when it was clearly identified as being the prime contractor. See Admin R at 106.

ratings were equal, then Danner, the low bidder, would have received the contract. See Admin R at 297 (¶ 7.4) (stating that an advantage in past performance is required for a bidder other than the low bidder to receive the contract); *id.* at 26 (showing Danner to be the low bidder). Thus, this ground alone would not have been sufficient for Gulf Group, whose success also required that it prevail on one of its other arguments. Gulf Group would still have needed either to show an arbitrary risk rating of satisfactory, or to succeed on what it termed its alternative argument concerning the SDB—that is, the claim that it would have been the low bidder had it not thought the SDB preference applied. See Pl's Opp'n & Cross–Motion for Summ J at 25–6.

*3. Did the Corps abuse its discretion by not seeking clarification from Gulf Group?*

Gulf Group's final argument challenging the evaluation of its proposal concerns the Corps's failure to use its discretion to seek a clarification of Gulf Group's past performance information. Although the Solicitation specified that the Corps intended to make the award without discussions with the offerors, it also made clear that certain "limited exchanges" short of discussions could still occur. See Admin R at 295–96 (¶¶ 3.6.3, 5.1). The Solicitation stated that "[o]fferors may be asked to clarify certain aspects of their proposal (for example, the relevance of past performance information)." *Id.* at 296 (¶ 5.1). A definition of "Clarification" appearing in the same section of the Solicitation informed offerors that this meant "limited exchanges, between the Government and Offerors, that may occur when award without discussions is contemplated," and cited "the relevance of an Offeror's past performance information" as an example of a potential clarification topic. *Id.* at 295 (¶ 3.6.3). This tracks nearly verbatim the FAR provision authorizing the use of clarifications when an award without discussions is contemplated. See 48 CFR § 15.306(a)(1)-(2) (2003).

When the TET determined that Gulf Group's presentation of its past performance information was inadequate to determine the scope of the past projects, it "concluded that Gulf Group should be required to clarify that their firm actual[ly] performed the scope of work delineated for each project," and assigned a risk rating "pending a satisfactory response to the clarification from Offeror." Admin R at 72 (¶ 8); see also *id.* at 88–89. The SSA, in his Source Selection Decision Document, described the TET's evaluation process as entailing "separately listing all strengths and weaknesses as well as deficiencies and required clarifications" for each proposal. Admin R at 25. Only Gulf Group was identified as requiring clarifications. See Admin R at 26–27; see also *id.* at 70–73, 75–76, 94–95, 96–97, 98–99. The SSA explained that "[w]ithout obtaining clarifications from Gulf Group for all the projects, the TET could not ascertain exactly what sort of work they performed to determine the relevancy of the projects." Admin R at 27. The SSA used language that gave the impression that these clarifications were requested, as he also noted that the risk rating was assigned "pending a satisfactory response to *the clarifications* from the contractor." *Id.* (emphasis added). But these clarifications were apparently not requested.

Gulf Group contends that this failure to seek clarifications amounts to an abuse of discretion. The Corps certainly did not do a very good job of explaining its decision not to seek clarification from Gulf Group. The TET explained that clarifications should be required from Gulf Group in order for it to provide a definitive risk rating, and the SSA stated that the risk rating assigned was conditional until a response to these clarifications was received—but no contemporaneous explanation was given as to why the clarifications were never requested. In a statement dated nearly three months later, the SSA states that "had discussions been conducted, these points would have been brought forth to the contractor for clarification." Admin R at 13. The only reason given for not seeking clarification of this information that was of vital importance to accurately determining Gulf Group's risk rating was thus, apparently, that the Corps had decided not to seek clarifications unless discussions were held. Gulf Group's challenge to this decision appears to come down to whether this reason is good enough.

In support of its argument that the Corps's failure to exercise its discretionary authority was itself an abuse of discretion, Gulf Group notes the announced goal of the clarifications policy: "This policy is expected to help offerors, especially small entities that may not be familiar with proposal preparation, by permitting easy clarification of limited aspects of their proposals." Pl's Opp'n & Cross–Motion for Summ J at 15 (quoting *Info Tech,* 316 F.3d at 1322 (quoting 62 Fed Reg 51224, 51229 (1997))). Gulf Group argues that it is exactly the sort of business this regulation was intended to benefit. *Id.* But the benefit that was created, if it could even be characterized as such, was not the *right* to clarify information in proposals. The benefit, instead, is that whenever the contracting officials think a clarification of certain aspects of a proposal would be helpful, *they* have the discretion to seek such a clarification, even when discussions with all bidders would not occur. The FAR allows, but does not require, such exchanges to take place. As this Court has found, "an agency representative has broad discretion to decide whether to communicate with a firm concerning its performance history." *JWK International Corp. v. United States,* 52 Fed.Cl 650, 661 (2002).

This case is peculiar in that one group of officials reviewing the proposals stated that it *would* require clarifications from Gulf Group, but the ultimate decisionmaker made the award without waiting for clarifications to be obtained. The TET concluded that clarifications should be required, for the reason that this would enable it to determine the scope of the specialized experience submitted by Gulf Group. The SSA did not request clarification, and at the time gave no reason at all for this decision. Had the SSA stated that clarification of the scope of past work would have consumed too many resources or unacceptably delayed the award date, then this issue would have been avoided. See 62 Fed Reg 51224 (1997) (FAR amendments, including

clarification provision, were adopted with "the intent of reducing the resources necessary for source selection and reducing time to contract award"). Had the SSA stated that clarification would be futile, because he could tell from the size of Gulf Group's past contracts that there was no chance for the clarification responses to improve the risk rating, this Court would have to defer to that judgment.

But no such reason was given by the SSA at the time the award was made. He subsequently explained that no clarifications were sought because no discussions had been conducted. Admin R at 13. The Corps's failure to articulate a timely reason for not seeking clarifications from Gulf Group understandably raised suspicions in the latter's eyes and no doubt contributed to the filing of this bid protest. The Court concludes, however, that this sort of decision does not require an explanation. The Executive branch [44] could have adopted a policy, in the FAR, requiring contracting officials to determine whether or not a clarification would assist in deciding the relevance of past performance information, and could have required such clarifications to be sought when the answer is "yes." This determination would then have been a part of the process in every negotiated procurement, and a strong argument could be made that an explanation of the decision is required.[45] This is not the policy that was enacted by the Executive branch, and is not the provision that was contained in the Solicitation. The Corps clearly stated, consistent with 48 CFR § 15.306(a)(1)-(2), that "[o]fferors *may* be asked to clarify certain aspects of their proposal," and further "cautioned" offerors "to provide their best terms for both price and past performance submission with their initial offers." Admin R at 296 (¶ 5.1) (emphasis added).

Whether or not it would be sound policy to require the contracting officials to explain every decision *not* to seek clarification, this is not the policy adopted in the FAR. See 48

---

44. The first chapter of the FAR, in which the clarification policy is found, is a joint product of the Department of Defense, the General Services Administration, and the National Aeronautics and Space Administration. See 48 Fed.Reg 42102 (1983).

45. Compare *Impresa Construzioni,* 238 F.3d at 1337–38 (requiring an explanation for a responsibility determination which, although required, need not be documented under the FAR).

CFR § 15.306(a)(1)-(2). Perhaps this would be slicing the components of a negotiated procurement decision a little too thin, or add costs that outweigh any potential benefits. Nor does the FAR ever require clarifications to be requested by agency officials. *Id.* This Court cannot substitute other policy goals or objectives for the ones duly enacted by the political branches. And this Court is not in the position, in any event, to determine whether it would be better for the Corps to abandon the policy of not seeking clarifications unless discussions are held. By allowing but not requiring agency officials to request clarifications, the Executive branch has determined that its own contracting officials will decide when this authority is useful; rather than create a right of offerors, the decision was made to instead provide an additional tool to agency officials.

To be sure, it would be helpful were agencies voluntarily to provide an articulated rationale for not seeking clarifications—especially where, as here, one level of evaluators concludes that clarifications *are* needed. In this particular case, it would clearly not have been an abuse of discretion for the SSA to have decided that a request for clarifications would be futile. After all, even if Gulf Group were to receive the better risk rating of "Very Good/Significant Confidence," it would not have been rational to award the contract to Gulf Group instead of Kokolakis, given the unusual operation of the HUBZone preference, discussed above. Because Danner's bid is not adjusted by the preference, the difference between its bid and Gulf Group's is much larger than the difference between its bid and Kokolakis's. See Admin R at 26. Thus, the price is much higher to "purchase" the "very good" risk rating from Gulf Group than from Kokolakis. And the SSA could rationally have concluded that, since only one of the ten past performance projects submitted by Gulf Group was of a similar magnitude to the AT/FP gates project, an "Exceptional/High Confidence" risk rating was not possible for Gulf Group. Compare Admin R at 159–68, with *id.* at 26, 284. An "Exceptional" evaluation of work performed on a relatively small contract does not translate into an "Exceptional" risk rating, see *id.* at 293 (¶ 3.0), as the latter indicates there was

"essentially no doubt" about the ability to perform the contract. It would have been reasonable for the SSA to conclude that past contract size is a good indicator of the ability to perform the solicited work. See *Maintenance Engineers,* 50 Fed.Cl at 415–16. Had the SSA bothered, a defense of his decision not to seek clarification could easily have been articulated.

*4. Did the Corps act contrary to law in its manner of notifying bidders that the SDB preference did not apply?*

■ Gulf Group makes an argument in the alternative that it was, in essence, misled into believing that the SDB price evaluation adjustment applied. Pl's Opp'n & Cross–Motion for Summ J at 25–26. It asserts that, relying on the applicability of this price adjustment, it raised its bid by ten percent over what it otherwise could have bid. Complaint ¶¶ 17, 54–55; Memo of Points & Authorities in Support of Motion, Ex I. Gulf Group's argument is based on a reference to the SDB price evaluation adjustment in the FAR provision governing the HUBZone small business price evaluation preference. See Admin R at 330.

The HUBZone small business price evaluation preference was clearly included in the Solicitation. The FAR provision for this preference, 48 C.F.R. § 52.219–4 (2003), is printed in full in section 700 of the Solicitation, among 116 other applicable FAR provisions. Admin R at 329–30. The Solicitation contains several references to the HUBZone preference. See Admin R at 238 (note number 5 for bidding schedule); *id.* at 293 (¶ 2.2.4) ("**The requirements of Section 00700, NOTICE OF EVALUATION PREFERENCE FOR HUBZONE SMALL BUSINESS CONCERNS, will be applied in making the Performance–Price Trade-Off analysis.**") (bold in original); *id.* at 297 (¶ 6.3) ("**The requirements of Section 00700, NOTICE OF EVALUATION PREFERENCE FOR HUBZONE SMALL BUSINESS CONCERNS, will be applied in determining which proposal is most advantageous to the Government.**") (bold in original).

In contrast to this clear inclusion of the HUBZone preference, the only mention of the SDB price evaluation adjustment in the entire Solicitation is the following, from the verbatim reprinting of the HUBZone FAR provision:

A concern that is both a HUBZone small business concern and a small disadvantaged business concern will receive the benefit of both the HUBZone small business price evaluation preference and the small disadvantaged business price evaluation adjustment (see FAR clause 52.219–23). Each applicable price evaluation preference or adjustment shall be calculated independently against an offeror's base offer.

These individual preference amounts shall be added together to arrive at the total evaluated price for that offer.

Admin R at 330 (§ 52.219–4).

The FAR provision concerning the SDB price evaluation adjustment, 48 C.F.R. § 52.219–23, was not included among those specifically incorporated in the Solicitation, and for good reason. By law, the Secretary of Defense is required to suspend this preference for one year if five percent of the total of the department's procurement, research, construction, and operation and maintenance contracts and subcontracts were entered into with certain categories of contractors in the most recent year for which data is available. 10 U.S.C. § 2323(e)(3)(B) (2000); see *Rothe Development Corp. v. United States Dept. of Defense*, 262 F.3d 1306, 1314 (Fed.Cir.2001). Whenever this five percent goal is reached, "the Secretary *shall issue a suspension, in writing*, of the regulations that implement" the SDB program. 10 U.S.C. § 2323(e)(3)(B)(ii) (emphasis added). This suspension, *in writing*, was issued and in effect for the year ending February 23, 2004. Admin R at 1511–12 (Memo, Suspension of the Price Evaluation Adjustment for Small Disadvantaged Businesses (June 24, 2003)).

Thus, it is not disputed that the SDB price evaluation adjustment could not apply to the Solicitation. Congress, by statute, has removed that authority from the Corps. Gulf Group's argument is, instead, that the language in the HUBZone clause referencing

the SDB price evaluation adjustment led it to believe the latter applied, and that the Corps should have provided notice in the Solicitation that this was not the case. Gulf Group argues that the exclusion of the SDB price evaluation adjustment constitutes a deviation from the FAR, see 48 C.F.R. § 1.401 (2003), and that failure to specify that its absence meant it did not apply violated the law requiring that bidders be informed of the basis for evaluations, see 10 U.S.C. § 2305 (2000).

Had the Solicitation not included, in the HUBZone provision, the language stating a "concern that is . . . a small disadvantaged business concern will receive the benefit of . . . the small disadvantaged business price evaluation adjustment," Admin R at 330, Gulf Group's confusion would have been avoided. But the Corps had determined that 48 C.F.R. §§ 19.1308(b) and 52.104(a) required the HUBZone provision to be inserted in the Solicitation without modification. Def's Motion for J Upon the Admin R at 24. It would still have been a simple matter for the Corps to have added language, perhaps where the references to the applicability of the HUBZone preference appear, see Admin R at 238, 293, 297, stating that the SDB provision has been suspended. But was the failure to include such language a "clear and prejudicial violation of applicable statutes or regulations," *Impresa Construzioni*, 238 F.3d at 1333, requiring that the contract award be set aside? The Court concludes it was not.

In the first place, it is not disputed that the Department of Defense issued a written suspension of the SDB preference, in the manner specified by the applicable statute. See 10 U.S.C. § 2323(e)(3)(B)(ii); Admin R at 1511–12. The statute contains no requirement that this suspension be attached to any solicitations. See 10 U.S.C. § 2323.

Second, although the suspension memorandum contained the word "deviation" in its subheading, see Admin R at 1511, this action was not, strictly speaking, a "deviation" as defined in 48 C.F.R. § 1.401. The SDB price evaluation adjustment clause was not a provision that is automatically in all solicitations, but is only included under certain circumstances. See 48 C.F.R. § 19.1104 (2003). More to the point, it cannot be "inconsistent

with the FAR" to omit a clause that the law specifically mandates cannot be used in a solicitation. The SDB provision of the FAR is based on the statutory authority of title 10, chapter 137, which includes 10 U.S.C. § 2323. See 63 Fed.Reg 35719, 35720 (1998); 64 Fed. Reg 36222, 36223 (1999). This authority specifically requires suspension of the SDB price evaluation adjustment clause in these circumstances, and thus any clause to the contrary would be beyond the power of the Executive branch. See 10 U.S.C. § 2323(e)(3)(B)(ii). Accordingly, the omission of the clause does not result in a policy, procedure, provision, clause, method, or practice that is "inconsistent with the FAR," and it is not the case that "prescription requires its use." 48 C.F.R. § 1.401(a),(b). To the contrary, the law required that the clause not be included, and its absence was all the notice to which bidders are entitled.

Further, Gulf Group's claim that it was somehow induced by the reference in the HUBZone clause to the SDB price evaluation adjustment to raise its price by ten percent, does not support relief in these circumstances. Even if Gulf Group believed that the SDB price evaluation adjustment would increase the effective bids of other offerors by ten percent for evaluation purposes, nothing made Gulf Group raise its own bid by ten percent other than its own business judgment. See *Data General*, 78 F.3d at 1564 (quoting from Board of Contract Appeals decision in which bid protester "lost the procurement not because [of the agency's ac-

tions but] because [the protester] made a poor business decision to offer an expensive system") (quoting *Fortran Corp. v. Department of Transportation*, GSBCA 12952–P, 1994 BPD ¶ 245, at 7, 1994 WL 589482 (Oct 27, 1994)).[46] Gulf Group cannot claim that this business decision was a reasonable and necessary response to the inclusion of the SDB price evaluation adjustment, since this response is based on the calculated risk that the non-SDB bidders would not do all they could to pare their bids down in light of the adjustment.[47] This business decision also assumed that no other SDB would bid, an assumption which apparently proved true but may not have been reasonable *ex ante*, considering that forty-eight firms received copies of the Solicitation. Admin R at 25. Compare *Si–Nor, Inc.*, B–286910, 2001 CPD ¶ 1 at 2 (Jan 5, 2001) (by taking business risk, protester "cannot now legitimately assert that the preference, rather than its own judgment, was the cause of the now failure to submit the low bid").

In any event, had Gulf Group literally followed the HUBZone provision, which advised it to "see FAR clause 52.219–23" to find out about the SDB price adjustment, it would not have discovered a promise of a ten percent adjustment. Instead, it would have found that "[t]he Contracting Officer will evaluate offers by adding a factor of ___ [*Contracting Officer insert the percentage*] percent to the price of all offers" of non-SDB bidders. 48 C.F.R. § 52.219–23(b) (2003) (bracketed ma-

**46.** Compare with *In re DataVault Corp.*, B–223937, B–223937.2, 86–2 CPD ¶ 594, at 3, 1986 WL 64412 (Nov. 20, 1986) ("'[A]n offeror proposing an inflated price in what on its face is a competitive procurement, based on an assumption that there will be no competition, does so at its own risk, when the assumption proves to be wrong.").

**47.** With commendable candor, Gulf Group's president confessed that the business "would have submitted a price 10% lower" had it known the SDB adjustment would not apply. Memo of Points & Authorities in Support of Motion, Ex I. Congress, however, assumed that small disadvantaged businesses needed assistance because higher costs prevented them from placing competitive bids. See National Defense Authorization Act for Fiscal Year 1987 HR Cong Rep 99–1001, 99th Cong, 2d Sess 501 (1986) reprinted in 1986 USCCAN 6560 (stating that goal behind

changes to set-aside companion program to SDB preference was "to insure that there is an incentive to grow, modernize and achieve economies of scale"; compare 61 Fed.Reg 26042, 26058 (1996) (Appendix to Department of Justice's affirmative action reform proposal) ("discrimination by private sector customers, prime contractors, business networks, suppliers, and bonding companies raises the costs for minority firms, which are then passed on to their customers. This restricts the competitiveness of minority firms, thereby impeding their ability to gain access to public contracting markets."); *id.* at 26061 (stating lack of access to special prices and discounts "drives up anticipated costs, and therefore the bid, for minority-owned businesses"). Thus, the SDB price evaluation adjustment was designed to be an accommodation to the higher costs facing SDBs, not an incentive for them to raise their bids.

**364**

terials in original; italics in original). Gulf Group thus cannot rely on the reference to the SDB provision as the cause of its decision to raise its bid by ten percent. Had it reviewed this FAR clause, it would have realized that its interpretation of the Solicitation gave rise to an obvious discrepancy that it should have sought to clarify before submitting an offer. See *CC Distributors, Inc. v. United States,* 38 Fed.Cl 771, 782 (1997). For all of the reasons above, the Corps's failure to state in the Solicitation that the SDB price evaluation adjustment was suspended violated no laws or regulations and did not clearly prejudice Gulf Group.

### D.   Injunctive Relief

Gulf Group has failed to carry its burden of demonstrating that the Corps's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To the contrary, the record establishes that the Corps did not act arbitrarily, did not abuse its discretion, and followed applicable laws and regulations. Having failed to prevail on the merits, Gulf Group's motion for permanent injunctive relief must necessarily also fail. See *Computer Sciences Corp. v. United States,* 51 Fed.Cl 297, 323 (2002).

### III.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendant's motion for judgment on the administrative record and correspondingly **DENIES** plaintiff's cross-motion. The Clerk of the Court is directed to enter judgment in favor of the United States.

**IT IS SO ORDERED.**