**BANNUM, INC., Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Dismas Charities, Inc., Defendant–Intervenor.**

**No. 09–546C.**

United States Court of Federal Claims.

Filed Under Seal: Nov. 24, 2009.

Reissued for Publication: Dec. 15, 2009.[1]

---

1. The Court issued this opinion under seal on November 24, 2009, and gave the parties until December 11, 2009 to submit any proposed redactions of competition-sensitive, proprietary, confidential or other protected information.

Pursuant to the Court's request, the parties submitted proposed redactions and these were discussed in a telephonic conference on December 15, 2009. Redactions accepted by the Court are indicated by [ . . . ].

Michael A. Gordon, Michael A. Gordon PLLC, Washington, DC, for Plaintiff.

Delisa M. Sanchez, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., Dionis M. Gauvin, Bureau of Prisons, Of Counsel, for Defendant.

Alex D. Tomaszczuk, with whom were Daniel S. Herzfeld, and Orest J. Jowyk, Of Counsel, Pillsbury Winthrop Shaw Pittman LLP, McLean, Virginia, for Defendant–Intervenor.

### OPINION AND ORDER

WHEELER, Judge.

In this bid protest, Plaintiff Bannum, Inc. ("Bannum") challenges a contract award by the Federal Bureau of Prisons ("BOP") to Dismas Charities, Inc. ("Dismas") for Residential Reentry Center ("RRC") services in Charleston, West Virginia. An RRC is more commonly known as a halfway house for federal prison inmates as they transition to independent living. Bannum, the incumbent contractor in Charleston, submitted the lowest price for these RRC services. However, in the initial evaluation and reevaluation following a sustained protest by the Government Accountability Office ("GAO"), the BOP selected Dismas as the best value offeror.

On October 6, 2008, Bannum protested the original award to Dismas at the GAO. The GAO sustained Bannum's protest on January 9, 2009, citing faults in the BOP's evaluation of Bannum's Technical/Management proposal

as the basis for its decision. The GAO recommended that the BOP reevaluate Bannum's and Dismas' proposals and issue a second source selection decision. After the reevaluation, the agency again selected Dismas as the awardee and Bannum protested this second award at the GAO. On July 29, 2009, the GAO denied Bannum's second protest and Bannum then filed this action in this Court on August 19, 2009.

The BOP based its award decision on Dismas' better ratings in the evaluation factors of Past Performance and Technical/Management. Bannum challenges the BOP's evaluation of both factors. Bannum's Past Performance rating stems in part from the BOP's default termination of another Bannum contract for RRC services in Austin, Texas. Bannum argues that the Austin default occurred under unique circumstances, making it irrelevant to the present Charleston contract evaluation and not indicative of Bannum's future management capability. In addition, Bannum alleges that the BOP did not properly evaluate three of the five factors comprising the Technical/Management rating.

Bannum seeks declaratory and injunctive relief that the award to Dismas is improper. Bannum claims that the BOP's award to Dismas was arbitrary and capricious, both in the agency's evaluation of proposals and in its departure from the solicitation's terms. Bannum requests a remand directing the BOP to conduct a more objective evaluation of the offerors' proposals.

█ For the reasons stated below, the Court concludes that Bannum's protest is without merit. While Bannum raises multiple protest grounds, its challenges to the BOP's award decision generally amount to mere disagreement with the BOP's reasonable Technical/Management and past performance evaluations. The Court finds nothing in the Administrative Record to suggest that the BOP acted arbitrarily or capriciously in evaluating Bannum's proposal or in making its "best value" determination. This Court gives deference to the BOP's Technical/Management and past performance ratings and will not substitute its judgment for that of the BOP if the agency's decision is

reasonable. *See, e.g., E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed.Cir.1996); *Gulf Group Inc. v. United States*, 61 Fed.Cl. 338, 351 (2004).

Accordingly, Plaintiff's motion for judgment on the Administrative Record is DENIED, and Defendant's and Defendant–Intervenor's cross-motions for judgment on the Administrative Record are GRANTED.

*Background*

### A. *The Solicitation*

On May 24, 2007, the BOP issued Request for Proposals No. 200–0976–MA (the "RFP") seeking competitive proposals for a provider of RRC services in Charleston, West Virginia. Administrative Record ("AR") 1–3. The BOP sought a contractor to establish a center for comprehensive community-based services for federal offenders, including those who are in the custody of the BOP, the United States Attorney General, or under the supervision of the United States Probation Office. AR 16. The facility would have a minimum capacity of 48 beds (44 male and four female). AR 258. The RFP called for a firm-fixed price indefinite quantity contract for a period of up to five years, with a two-year base period and three one-year options. AR 6–7. Contractors had to own or lease a facility for the services, and submit proof of proper zoning in accordance with Charleston's laws and ordinances. AR 16, 228. The RFP required offerors to provide training and work programs for residents, as well as to ensure accountability for the residents' participation in these programs. AR 235.

### B. *Method of Evaluating Proposals*

The RFP set forth the evaluation criteria by which the BOP's Source Selection Official ("SSO") would review and rate the offerors' proposals in three main areas: (1) Technical/Management, (2) Past Performance, and (3) Price. AR 232–233. The non-price factors of Past Performance and Technical/Management when combined were significantly more important than Price. *Id.* Past Performance was more important than Technical/Management. *Id.* Price would become increasingly more important as the non-price factor ratings approached equality. *Id.* The BOP intended to evaluate the non-price factors using an adjectival rating system, defined as follows:

BLUE (Very Good): Offeror's proposal meets and exceeds the requirements of the solicitation. Their proposal shows they have a very good solution for meeting the needs and objectives of the program. One or more significant strengths exist. Weaknesses may exist, but none are considered significant and are easily correctable.

GREEN (Acceptable): Offeror's proposal meets the minimum requirements of the solicitation. Their proposal shows they have an acceptable solution for meeting the needs and objectives of the program. Strengths and weaknesses may exist. The weaknesses are correctable.

YELLOW (Poor): Offeror's proposal does not meet some of the requirements of the solicitation. Their proposal shows they have a poor solution for meeting the needs and objectives of the program. Weaknesses outweigh any strengths that may exist. The weaknesses are difficult to correct.

RED (Unacceptable): Offeror's proposal fails to meet the requirements of the solicitation. Their proposal shows they have an unacceptable solution for meeting the needs and objectives of the program. There are numerous weaknesses. The weaknesses will be very difficult to correct or are not correctable.

AR 233.

#### 1. *Past Performance*

Under the Past Performance factor, the BOP evaluated "the offeror's probability of successfully performing the effort as proposed based on their record of performance in current and past relevant contract efforts." AR 233. To obtain past performance data, the RFP required offerors to submit five relevant contracts or subcontracts that were currently being performed or were performed within the previous three years. AR 199. The RFP defined "relevant" as any contract which was "of similar size, scope and complexity" to the current solicitation. *Id.*

The RFP did not limit the BOP's consideration of relevant past performance to the five contracts submitted by each offeror.

AR 233. The RFP permitted the BOP to "consider efforts performed by the offeror for agencies of the federal, state, or local governments and commercial customers as potentially relevant to the Past Performance evaluation." *Id.* Further, if the relevant past performance information indicated any performance problems, the BOP was required to "consider the number and severity of the problems and the appropriateness and effectiveness of any corrective actions taken." *Id.*

The RFP provided that the BOP would evaluate the offeror's past performance data on the basis of five factors of equal importance: (1) Accountability, (2) Programs, (3) Community Relations, (4) Personnel, and (5) Communications and Responsiveness. AR 234. The BOP intended to assign an adjectival rating to each of the five factors of the Past Performance evaluation, and to assign an overall adjectival rating. AR 233.

The Accountability factor assessed "the offeror's record of performance and level of success in developing and implementing offender accountability programs." AR 234. The Programs factor evaluated the offeror's record "in assisting offenders in successfully reentering the community." *Id.* The Community Relations factor considered the offeror's record "in acquiring and maintaining public support for community corrections programs." *Id.* The Personnel factor valued the offeror's record of "recruiting, training and retaining an adequate staff of personnel with the necessary skills and integrity to ensure successful continuous performance of the contract." *Id.* Finally, the Communication and Responsiveness factor examined the offeror's record "in ensuring open communications about and rapid response to customer needs and requirements." *Id.*

2. *Technical/Management*

In the second evaluation factor, Technical/Management, the RFP identified five factors of equal importance: (1) Site Location, (2) Accountability, (3) Programs, (4) Facility, and (5) Personnel. AR 234–35. The RFP explained that the Source Selection Evaluation Board ("SSEB") would evaluate the Technical/Management area of each proposal, rating each element and "giving the highest rating to the best overall approach." AR 232. The Site Location factor for Technical/Management included two sub-factors of equal importance: (1) Site Validity and Suitability, and (2) Community Relations Program. AR 234–35.

The Site Validity and Suitability sub-factor called for the BOP to evaluate "the proposed site location" and "the validity of the offeror's Right–to–Use and Zoning Approval." AR 234. This sub-factor also included an analysis of the environmental impact of each proposal and the offeror's responsiveness to related proximity requirements defined in the statement of work and Section J of the RFP. AR 234–35. Regarding environmental impacts, the RFP required offerors to list local area concerns within a half-mile radius of the facility. AR 182–83. The RFP included "schools, day-care centers, historical landmarks, and other residential facilities" as examples of potential local area concerns. AR 211. For each concern listed, the RFP advised offerors to describe their approach to mediating possible community opposition. AR 204. The other sub-factor, the Community Relations Program, assessed the offeror's proposed program for "educating and interacting with the local community in order to acquire and maintain public support." AR 235.

The second factor, Accountability, considered the offeror's proposed plan for ensuring that offenders could accurately be accounted for at all times. *Id.* Specifically, the BOP sought offerors who could account for offenders inside the facility, at work assignments, in all other activities outside the facility, and while under home confinement. *Id.* The Programs factor evaluated the offeror's plans for "assessing the individual needs of each offender to assist their re-entry into the community." *Id.* This factor included an evaluation of the offeror's programs for assisting with employment and housing, developing improved life skills such as money management, parenting and family reunification. *Id.* An ability to understand and leverage relevant community resources was also a component of this factor. *Id.* The Facility factor evaluated "the offeror's proposed facility with

regard to (1) overall quality, (2) degree of compliance to applicable local, state, national health, safety, environmental laws, regulations, Executive Orders, and building codes, and (3) the soundness and credibility of the offerors' plan for ensuring operational availability within 120 days after contract award." *Id.* Lastly, the Personnel factor assessed "the offeror's quality, credibility and innovativeness of the offeror's approach for recruiting, training and retaining an adequate staff of Community Correction Programs (CCP) personnel with the necessary skills to ensure successful, continuous performance of the contract." *Id.*

The RFP called for the BOP to conduct a separate risk assessment for each factor in the Technical/Management evaluation, with the exception of the Site Validity and Suitability subfactor, to "reflect the Government's degree of confidence in the offeror's ability to perform the effort described in their Technical/Management proposal." AR 236. In the Site Validity and Suitability subfactor, "the level of risk associated with the offeror's proposal is inherent in the subfactor definition and [would] thus be reflected in the subfactor color/adjectival rating and rationale." *Id.* In assessing risk, the RFP required the BOP to consider to what degree a proposed aspect of the Technical/Management solution "could pose potential adverse impacts on price, schedule or performance of the effort." Id. In determining the best value offeror, the BOP would consider the findings and results of the proposal risk assessment. *Id.*

### 3. *Price*

The RFP did not permit the BOP to "specifically score or rate the offeror's price," except to ensure its reasonableness. AR 235. The RFP required the BOP to assess the offeror's price against the proposal evaluation results in the non-price areas to determine the best value to the Government. *Id.*

### C. *Submission and Evaluation of Initial Proposals*

The BOP received timely proposals from Bannum and Dismas. AR 262. On October 2, 2007, the BOP notified both Bannum and Dismas that their proposals were within the competitive range for further discussions and negotiations. AR 336, 445. In these notifications, the BOP addressed several concerns about each offeror's proposal. *See id.* For Bannum, the BOP asked if any schools were within a half-mile of the proposed facility. AR 337. Further, the BOP indicated concerns about faulty electrical outlets, the facility's layout, and its wheelchair accessibility. AR 337–38.

In response to the request regarding nearby schools, Bannum cited one location within a half-mile of its proposed facility, but stated it did not pose any concerns. AR 343. Bannum added that no community concerns regarding its existing site had arisen. *Id.* Bannum promised to address any new concerns in a timely manner. AR 344. Regarding wheelchair access, Bannum stated that this issue had never been raised in any previous inspection. AR 350. Bannum asserted that the facility allows for wheelchair access. *Id.* Bannum promised to make any improvements if a third-party inspection indicated a need for alterations. AR 351. Bannum also offered an amended floor plan in satisfaction of the BOP's concerns about the existing facility layout. AR 351, 437. Finally, Bannum argued that the BOP had not provided sufficient detail regarding the allegedly inoperable electrical outlets. AR 351. Bannum promised to repair or replace any deficient outlets after the contract award and prior to performance. *Id.*

With regard to Dismas' proposal, the BOP requested further clarification on how Dismas would leverage and network with the local community. AR 446. In addition, the BOP requested clarification concerning the method Dismas planned to use in screening personnel applicants. *Id.* Dismas responded with letters of community support and furnished information describing [ . . . ] and [ . . . ]. AR 450, 453.

On April 25, 2008, the BOP notified both Bannum and Dismas of a change in applicable Department of Labor wage rates. AR 933, 955. The agency invited each offeror to submit revised final proposals. *Id.* Bannum responded with revised rates, a decrease compared with the prices paid under its in-

cumbent contract. AR 935. In its revised proposal, Bannum also noted several strengths, one of which was Bannum's plan [...]. AR 936. Bannum also described its intended use of [...] to bolster its accountability procedures. AR 940. The BOP responded to Bannum's submission by indicating that its request for wage rate revisions did not include an opportunity to supplement the proposal in other areas. AR 963. When Bannum challenged this BOP decision based on the literal language of the letter requesting wage revisions, the BOP took corrective action on May 29, 2008 to revise the letter. AR 982. The new letter permitted responses to include proposal revisions as well as wage rate information. *Id.* On July 10, 2008, a second wage rate change initiated another BOP request for revised price proposals. AR 1847. Bannum's final total proposed price was [...]. AR 1708. Dismas' final total price was $5,008,641.60. *Id.*

### D. *First Source Selection Decision and Sustained GAO Protest*

On September 25, 2008, the BOP notified Dismas of its selection for award of the Charleston, West Virginia RRC services contract. AR 1224. The SSO chose Dismas for award because Dismas received higher overall ratings in its Past Performance and Technical/Management evaluations. The SSO found these higher ratings warranted paying a premium over Bannum's lower priced offer. AR 1219–21. The Source Selection Decision ("SSD") reflected that the evaluators assigned Bannum's proposal a rating of Green/Acceptable under each of the five Technical/Management factors, resulting in an overall Technical/Management rating of Green/Acceptable. Dismas received the highest rating of Blue/Very Good under each of the five Technical/Management factors, resulting in an overall rating of Blue/Very Good.

The SSO assigned both offerors a Blue/ Very Good rating for Past Performance. Bannum, however, received a low-end Blue rating. AR 1208, 1211. As required by the RFP, Bannum and Dismas submitted past performance information on five of their BOP contracts. AR 1208, 1210. All of the con-

tracts submitted by Dismas were found to be "highly relevant" because in each contract Dismas provided a major-use level of services similar to those sought in the RFP in Charleston. AR 1208. Dismas received a [...] rating on each contract submitted and, therefore, the offeror received an overall Blue rating for Past Performance. *Id.* Four of Bannum's contracts were found to be "moderately relevant" because Bannum provided a moderate-use level of services slightly smaller to those solicited in the Charleston RFP. AR 1210. One contract was considered "somewhat relevant," because Bannum provided only a minor-use level of similar services. *Id.* Bannum received a [...] rating on one of the four moderate-use contracts. AR 1211. Bannum's remaining three moderate-use contracts and its minor-use contract received [...] ratings. *Id.*

In addition, although not submitted, the BOP considered Bannum's incumbent contract for the Charleston services because it was "highly relevant" and for a major-use facility. *Id.* Bannum received a [...] rating for its incumbent contract. *Id.* Further, the BOP noted that Bannum had been terminated for default on March 2, 2007 on a very similar BOP contract in Austin, Texas. AR 1213. The SSD explained that the Austin contract was terminated due to Bannum's "lack of proper zoning, lack of documentation indicating a proper 'Right to Use,' inability to perform renovations at the proposed performance site due to lack of proper permits, and inability to correct a myriad of deficiencies noted during the pre-occupancy inspection of their proposed site." AR 1106–07. As a result of its lower rating on the "highly relevant" incumbent contract and the consideration given to its termination for default on the Austin contract, Bannum received an overall Past Performance rating at the low end of a Blue/Very Good rating. AR 1211.

In response to the notification of award, Bannum requested a debriefing, and on October 1, 2008 the BOP provided a written debriefing. AR 1255, 1257. Bannum subsequently filed a protest at the GAO. The GAO sustained Bannum's protest on January 9, 2009, because the GAO found the BOP's evaluation of both proposals under the three

Technical/Management factors of Site Location, Accountability, and Personnel to be unreasonable. AR 1967. The GAO, however, upheld the BOP's evaluation of Bannum's Past Performance, stating:

> Moreover, while we agree with the protester that the circumstances that led to the termination for default of its Austin contract are not present here, we nonetheless think that it was reasonable for the contracting officer to have considered Bannum's handling of the situation as showing a lack of management ability, and on that basis, to have concluded that a slight lowering of its past performance rating (to the low end of very good) was warranted.

AR 1966. The GAO recommended that the BOP reevaluate the proposals and make a new source selection determination. AR 1967.

### E. Second Source Selection Decision and Denied GAO Protest

A new SSEB comprised of different personnel performed the reevaluation of Bannum's and Dismas' technical proposals. AR 1062, 1673. As recommended by the GAO, the SSEB limited its reevaluation to the three Technical/Management factors of Site Location, Accountability and Personnel. AR 1698–1706. In the initial evaluation, Bannum was rated a Green/Acceptable in Site Location, Accountability and Personnel. Dismas was rated as Blue/Very Good in those categories. AR 1054–60. Upon reevaluation, both proposals were rated as Green/Acceptable under the Site Location factor, and as Blue/Very Good under the Accountability and Personnel factors. AR 1699–1704. Significantly, the reevaluation resulted in a lowering of Dismas' rating for the Community Relations sub-factor from Blue/Very Good to Green/Acceptable and a strengthening of Bannum's rating from Green/Acceptable to Blue/Very Good in Accountability and Personnel. AR 1054–60, 1699–1704. The BOP did not reevaluate the proposals under the Programs or Facility factors. AR 1698. Thus, Bannum's proposal continued to be rated as Green/Acceptable, and Dismas' proposal as Blue/Very Good, under those factors. AR 1704–06. In sum, the final evaluation resulted in Bannum receiving two Blue/Very Good ratings for the Technical/Management factors of Accountability and Personnel, while it received three Green/Acceptable ratings for the Technical/Management factors of Programs, Facility, and Site Location. AR 1698–1706. Dismas received four Blue/Very Good ratings in the Technical/Management factors of Accountability, Programs, Facility and Personnel, while it received one Green/Acceptable rating for the Technical/Management factor of Site Location. *Id.* The BOP did not reevaluate the Past Performance factors and therefore Bannum's rating remained on the low-end of Blue/Very Good, while Dismas retained its previous unqualified Blue/Very Good Past Performance rating. AR 1710, 1713. Combining the results of both Source Selection Decisions, the final adjectival evaluations for Dismas and Bannum are shown in the following chart:

### First Source Selection Decision Ratings

| T/M Evaluation Factor | Bannum | Dismas |
| --- | --- | --- |
| Site Location | Green | Blue |
| Site Validity and Suitability | Green | Green |
| Community Relations Program | Green | Blue |
| Accountability | Green | Blue |
| Programs | Green | Blue |
| Facility | Green | Blue |
| Personnel | Green | Blue |
| Overall T/M Rating | Green | Blue |

### Past Performance Rating

| | Bannum | Dismas |
| --- | --- | --- |
| Reference 1 | [ . . . ] (Moderate use) * | [ . . . ] (Major use) |
| Reference 2 | [ . . . ] (Moderate use) | [ . . . ] (Major use) |
| Reference 3 | [ . . . ] (Moderate use) | [ . . . ] (Major use) |
| Reference 4 | [ . . . ] (Minor use) | [ . . . ] (Major use) |
| Reference 5 | [ . . . ] (Moderate use) | [ . . . ] (Major use) |
| Reference 6 (Incumbent contract) | [ . . . ] (Major use) | N/A |

| | | |
|---|---|---|
| Reference 7 (Austin) | Unstated | N/A |
| Overall Past Performance Rating | Blue (Low end) | Blue |

Second Source Selection Decision Ratings

| T/M Evaluation Factor | Bannum | | Dismas | |
|---|---|---|---|---|
| Site Location | Green | | Green | |
| Site Validity and Suitability | | Green | | Green |
| Community Relations Program | | Green | | Green |
| Accountability | Blue | | Blue | |
| Programs (Was not re-evaluated) | Green | | Blue | |
| Facility (Was not re-evaluated) | Green | | Blue | |
| Personnel | Blue | | Blue | |
| **Overall T/M Rating *** | **Green** | | **Blue** | |

| **Overall Past Performance Rating** | **Was not re-evaluated** |
|---|---|

\* Minor, Moderate and Major use labels indicate the size of the relevant facility (0–15 beds, 16–30 beds, and 31 or more beds, respectively)

Following the SSEB's reevaluation on April 27, 2009, the SSO determined that the award to Dismas was the best value for the BOP. AR 1721–25.

Bannum filed a second protest with the GAO, alleging in part that the BOP's evaluation of Bannum's Technical/Management proposal under the Programs, Facility, and Site Location factors was unreasonable and that the BOP improperly considered Bannum's recent termination for default and incumbent contract rating in assessing past performance. AR 1969–70. Bannum also argued that the SSO lacked a reasonable basis for finding Dismas' combination of technical merit and price to represent the best value to the Government. *Id.* The GAO denied this second protest on July 29, 2009, finding the BOP's evaluation of Bannum's past performance and Technical/Management proposal to be reasonable. AR 2090.

### F. *Bannum's Protest in this Court*

On August 19, 2009, Bannum filed a three-count complaint in this Court (1) alleging that the BOP improperly evaluated Bannum's past performance and its Technical/Management proposal, (2) seeking a declaratory judgment that the award to Dismas was arbitrary and capricious, and (3) requesting a permanent injunction to prohibit further performance on the contract until a proper reevaluation could be conducted. The Court received the BOP's Administrative Record on August 31, 2009. Bannum filed its motion for judgment on the Administra-tive Record on September 14, 2009. The BOP and Dismas submitted their responses and cross-motions for judgment on the Administrative Record on October 2, 2009, to which Bannum replied on October 13, 2009. The BOP and Dismas filed reply briefs in support of their cross-motions for judgment on the Administrative Record on October 21, 2009. The Court heard oral argument on the parties' cross-motions for judgment on October 27, 2009.

### Discussion

### A. Jurisdiction and Standard of Review

■ The Court of Federal Claims has jurisdiction to review pre-award and post-award bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1)(2006), as amended by the Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, § 12(a)-(b)(1996).

■ In deciding cross-motions for judgment on the administrative record, this Court reviews an agency's action to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (incorporated by reference in 28 U.S.C. § 1491(b)(4)); *Bannum, Inc. v. United States,* 404 F.3d 1346, 1351 (Fed.Cir.2005); *Banknote Corp. of Am. v. United States,* 365 F.3d 1345, 1350–51 (Fed.Cir.2004) (quoting *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057–58 (Fed.Cir.2000)). An agency action may only be set aside if there is a "clear and

prejudicial" violation of the law, or the agency's action lacks a rational basis. *Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed.Cir.2009). Therefore, the Court's standard of review in bid protests is "highly deferential." *Advanced Data Concepts, Inc.*, 216 F.3d at 1058; *Rust Constructors, Inc. v. United States*, 49 Fed.Cl. 490, 493 (2001). As reiterated by the Federal Circuit, "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss Co.*, 77 F.3d at 449; *see also Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed.Cir.2004); *LaBarge Prods., Inc. v. West*, 46 F.3d 1547, 1555 (Fed.Cir.1995) (citing *Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 617 F.2d 590, 597–98 (1980)); *EP Prod., Inc. v. United States*, 63 Fed.Cl. 220, 223 (2005), *aff'd*, 163 Fed.Appx. 892 (Fed.Cir. 2006). There exists a "strong presumption that government officials act correctly, honestly, and in good faith when considering bids." *Bean Stuyvesant, L.L.C. v. United States*, 48 Fed.Cl. 303, 320 (2000) (citing *Analytical & Research Tech., Inc. v. United States*, 39 Fed.Cl. 34, 42 (1997)). Even if the court does not agree with the agency's decision but finds the decision ultimately to be reasonable, "the court should stay its hand." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971)). "Agency technical evaluations, in particular, should be afforded a greater deference by the reviewing court." *Benchmade Knife Co., Inc. v. United States*, 79 Fed.Cl. 731, 735 (2007) (citing *E.W. Bliss Co.*, 77 F.3d at 449; *Omega World Travel, Inc. v. United States*, 54 Fed.Cl. 570, 578 (2002)).

Under the described deferential standard, the disappointed bidder must demonstrate that there was no rational basis for the agency's decision. *Biospherics, Inc. v. United States*, 48 Fed.Cl. 1, 8 (2000) (citing *Delbert Wheeler Constr., Inc. v. United States*, 39 Fed.Cl. 239, 247 (1997), *aff'd*, 155 F.3d 566, 1998 WL 244202 (Fed.Cir.1998)). In addition, a protestor will only prevail in a bid protest if it can establish that the error in the procurement process was prejudicial. *See Data Gen. Corp. v. Johnson*, 78 F.3d

1556, 1562 (Fed.Cir.1996). To demonstrate prejudice, "the protestor must show 'that there was a substantial chance it would have received the contract award but for that error.'" *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir.1999) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed.Cir.1996)). If the solicitation contemplates award on a "best value" basis, as here, the disappointed bidder's burden only increases. *See Galen Med. Assocs.*, 369 F.3d at 1330 (citing *E.W. Bliss. Co.*, 77 F.3d at 449).

### B. *The BOP's Evaluation of Bannum's Past Performance*

Bannum argues that its termination for default on the Austin, Texas contract resulted from unique circumstances unable to recur elsewhere. Therefore, Bannum asserts that the termination was irrelevant to the current procurement and could not reasonably be used to justify the BOP's finding of "decreased" confidence in Bannum's ability to perform in Charleston. Further, Bannum maintains that the BOP's [...] rating of its incumbent Charleston contract is contrary to the RFP, inconsistent with the record, and an unreasonable reflection of unequal and disparate treatment.

Although Bannum disagrees with the BOP's consideration of its default termination and the BOP's low rating of its incumbent contract, this disagreement alone is not sufficient to persuade the Court that the BOP acted unreasonably. For the reasons stated below, the Court concludes that the BOP conducted a reasonable evaluation of Bannum's past performance and finds no grounds for disturbing the low-end Blue/ Very Good Past Performance rating. Indeed, a review of the Record reveals that the BOP likely was generous in its overall rating of Bannum's past performance. The Court will address each of Bannum's past performance arguments below.

### 1. *The Austin, Texas Default Termination*

This case represents the second time in less than a year that Bannum has sought to

have this Court validate its narrow view of the Austin default termination as irrelevant to future contract awards. *See Bannum, Inc. v. United States,* No. 09–15C (Fed.Cl. March 18, 2009), *aff'd,* No. 09–CV–015, slip op. at 1 (Fed.Cir. Nov. 5, 2009). As in the first case, this Court finds that it is reasonable for an agency to consider an offeror's default termination for relevant services in the agency's past performance evaluation of a new proposal from the same offeror.

The Court will not substitute its judgment for that of the BOP. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ("The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency."). Consequently, it is not the role of this Court to determine the substantive relevance of Bannum's default to the BOP's needs in the instant procurement. Instead, it is the Court's duty to assess whether the BOP acted reasonably and in compliance with the law in considering the default termination in its evaluation. In conducting this analysis, the Court affords significant deference to the BOP's evaluation of Bannum's past performance. *See Westech Int'l v. United States,* 79 Fed.Cl. 272, 293 (2007) ("When the court considers a bid protest challenge to the past performance evaluation conducted by the agency, the 'greatest deference possible is given to the agency.'") (quoting *Gulf Group Inc. v. U.S.,* 61 Fed.Cl. 338, 351 (2004)).

██ Bannum's argument simply reflects disagreement with the BOP's assessment of its default termination. Bannum fails to demonstrate why the BOP's judgment is unreasonable or contrary to law or regulation. *See Cube Corp. v. United States,* 46 Fed.Cl. 368, 386 (2000) ("A protestor's mere disagreement with the agency's evaluation is not itself sufficient to establish that the evaluation was unreasonable.") (quoting *Technical & Admin. Servs. Corp.,* B–279828, 1998 WL 681275, at *2 (Comp.Gen. July 24, 1998)). Bannum argues that its Austin default should not be considered because the "specific negative performance cannot recur in the future performance of the contract under evalua-

tion." Bannum Mot. J. on Administrative R. at 24. The negative performance that Bannum references is its failure to acquire the necessary zoning permits, a contributing factor to its Austin default termination. Given that there are no zoning requirements to be met in Charleston, Bannum argues that the Austin default termination cannot be relevant to its Charleston past performance evaluation. However, a failure to obtain permits was not the only basis for the default termination, and therefore Bannum's relevance argument does not accurately characterize the record. In fact, Bannum's failure to obtain permits was one of several reasons for its termination. The record makes clear that the BOP terminated the Austin contract due to Bannum's "inability to perform renovations at the proposed performance site due to lack of proper permits" *and* its "inability to correct a myriad of deficiencies noted during the pre-occupancy inspection of their proposed site." AR 1106. The BOP was rightly concerned that Bannum's Charleston facility could be plagued by another "myriad" of uncorrected deficiencies. Significantly, Bannum indicated that it would defer resolution of several pre-site inspection deficiencies at its Charleston facility until after award of the contract. The potential for uncorrected deficiencies in the Charleston procurement made the similar uncorrected deficiencies at the Austin facility relevant. Even if the Charleston deficiencies differ from those in Austin, the Court finds it was nevertheless reasonable for the BOP to take Bannum's performance in Austin into account in assigning Bannum a low-end Blue/Very Good rating.

Not only was the BOP's consideration of the Austin default termination reasonable, it was also legally required. Indeed, if the BOP had turned a blind eye to the Austin contract, it would have shirked its legal duties. The Federal Acquisition Regulation ("FAR") requires an agency to consider, in addition to information supplied by the offerors, "information obtained from any other sources, when evaluating the offeror's past performance." *See* 48 C.F.R. § 15.305(a)(2)(ii). Agencies are given discretion to determine the relevance of all past performance information. *Id.* In this procurement, the contracting officer had person-

al knowledge of Bannum's Austin default termination and therefore, FAR 15.305(a)(2)(ii) obligated the BOP to consider Bannum's Austin performance along with the five other contracts Bannum identified.

Similarly, the RFP mandated that the SSO take into account any relevant past performance. AR 233. The RFP stated that the past performance evaluation would be conducted by "reviewing aspects of an offeror's relevant present and recent past performance, focusing on and targeting performance that was relevant to the Past Performance factors." *Id.* The RFP continued:

> The recency and relevancy of Past Performance information is critical to the Government's evaluation ... *Where [the] relevant performance record indicates performance problems,* the Government *will* consider the number and severity of the problems and the appropriateness and effectiveness of any corrective actions taken (not just planned or promised). The government may review more recent contracts or performance evaluations to ensure corrective actions have been implemented and to evaluate their effectiveness.

*Id.* (emphasis added). Contrary to Bannum's position, the RFP did not limit consideration of past performance problems to those which might recur. Instead, the RFP stated that all performance problems in the "relevant performance record" would be considered. The BOP acted reasonably in finding the Austin contract to be part of Bannum's relevant performance record because of its similar size, scope and complexity to the Charleston contract. AR 199. Once the Austin contract was found to be relevant, the RFP required the BOP to consider the number and severity of the Austin performance problems in its evaluation, regardless of whether those problems could recur in Charleston.

 Apart from its argument that the BOP's consideration of its default termination was unreasonable, Bannum also alleges that the BOP inadequately documented the effect of the Austin contract on Bannum's past performance evaluation in the source selection decision. This Court, however, finds that the BOP provided a sufficient explanation. Bannum's reliance on *Wackenhut*

to support its allegations is misplaced. *See Wackenhut Servs., Inc. v. United States,* 85 Fed.Cl. 273, 296–300 (2008) (holding that the agency violated the Administrative Procedures Act by failing to create any record to explain an increase in a technical factor between its preliminary and final findings). Here, in the final SSD, the BOP *did* sufficiently articulate its reasons for assigning Bannum a low-end Blue/Very Good rating, in particular acknowledging the impact of Bannum's default termination. Specifically, the BOP explained:

> Although Bannum received an overall rating of Blue–Very Good, the lower rating received for its highly relevant (incumbent) contract and the additional consideration given to the termination for default Bannum received, the Contracting Officer has determined that it is at the lower end of this performance rating.

AR 1107. An agency is required to proffer an explanation for its action but that explanation need not be extensive. *Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). The Court's role is to ensure that the agency examined the relevant data and articulated a " 'rational connection between the facts found and the choice made.' " *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.,* 463 U.S. at 43, 103 S.Ct. 2856 (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). The Court is satisfied that the BOP met those requirements here with its brief but explicit justification for Bannum's rating.

### 2. Bannum's Incumbent Contract

 Bannum also believes its incumbent Charleston contract should have received a [ . . . ] rating instead of a [ . . . ] rating. Although the record indicates that Bannum did receive [ . . . ] ratings during some performance periods of the incumbent contract, Bannum has not demonstrated that the BOP was unreasonable in assigning it an overall [ . . . ] rating. AR 941. In the Contract Evaluation Form ("CEF"), Bannum's incumbent contract received [ . . . ] ratings in three areas (Accountability, Site Validity and Suitability, and Communications and Responsiveness)

and ratings of [ . . . ] in three other areas (Programs, Community Relations, and Personnel). For this procurement, however, the RFP did not include the CEF's factor of Site Validity and Suitability in the list of past performance criteria. Accordingly, the BOP only considered Bannum's ratings in the five remaining areas. Given that Bannum received ratings of [ . . . ] in three of the RFP's five past performance factors, the BOP appropriately assigned Bannum's incumbent contract an overall past performance rating of [ . . . ]. Bannum's mere disagreement with the BOP's incumbent contract rating is not sufficient for this Court to overturn it. An agency does not act unreasonably when it sets forth specific past performance evaluation criteria and then applies those criteria. Bannum could have challenged the RFP's evaluation criteria in a pre-award protest, but it cannot do so now. *See Blue & Gold Fleet, L.P. v. United States,* 492 F.3d 1308, 1313 (Fed.Cir.2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection in a bid protest action in the Court of Federal Claims."). The terms of the RFP informed Bannum from the start that only five of the six possible past performance evaluation criteria in the contractor evaluation forms would be considered in this procurement.

Even if all six factors from the CEF had been used to evaluate Bannum's incumbent contract, the BOP may have reached the same overall past performance rating. If the Site Validity and Suitability factor had been included, Bannum's incumbent contract then would have had an equal number of [ . . . ] and [ . . . ] ratings. The BOP could have reasonably assigned Bannum's incumbent contract a [ . . . ] rating or a [ . . . ] rating. Ultimately, even if the evaluation criteria were modified as Bannum suggests, the BOP still could have reasonably found that Bannum deserved an overall *low end* Blue/Very Good past performance rating. This is the past performance rating that Bannum ultimately received.

### 3. *Lack of Prejudice to Bannum*

 Regardless of whether the BOP's method of evaluating past performance in the instant procurement was proper, Bannum has not shown that it was prejudiced by the BOP's actions. To establish that it suffered "significant prejudice," Bannum must prove that there was a "substantial chance" it would have received the contract award if not for the BOP's errors in the past performance evaluation. *See Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003) (citing *Alfa Laval Separation, Inc.,* 175 F.3d at 1367). A new past performance evaluation would not create a substantial chance of Bannum receiving the contract award. Even if the BOP's past performance evaluation were conducted as Bannum urges, excluding the Austin default termination and increasing the incumbent contract rating, the BOP still could have rated Bannum the same as it did. Although Charleston is a major-use facility (exceeding 30 beds), the five contracts that Bannum submitted for its past performance review were not major-use contracts. Four of the contracts were for moderate-use and one was for minor-use. Among the four moderate-use contracts, one received a [ . . . ] rating, and the remainder received [ . . . ] ratings. AR 1107, 1713. The minor-use contract also received a [ . . . ] rating. *Id.* However, the BOP considered these five contracts less relevant than major-use contracts.

In contrast, Dismas submitted five highly relevant major-use contracts, all of which received superior [ . . . ] ratings. Bannum has not challenged the ratings assigned to Dismas in the Past Performance evaluation. Consequently, Dismas' superior ratings would remain intact in any reevaluation of past performance. When compared to Bannum's less relevant contracts, one of which received a [ . . . ] rating, the higher rated more relevant Dismas contracts would continue to justify a slightly lower overall Past Performance rating for Bannum. These facts alone are sufficient to conclude that Bannum would not have had a substantial chance of receiving a higher rating than Dismas in the most important evaluation factor, even if the past performance evaluation were

conducted as Bannum desires. Indeed, the BOP was entitled under the RFP to downgrade Bannum for supplying less relevant contract references, but it chose not to do so. Therefore, rather than being prejudicial, the BOP's decision to grant a Past Performance rating on the low-end of Blue/Very Good was more than generous, given Bannum's submission of smaller, less relevant contract references in its proposal.

## C. The BOP's Evaluation of Bannum's Technical/Management Proposal

Bannum alleges that the BOP improperly evaluated its Technical/Management proposal under the Site Location, Facility, and Programs evaluation factors. In each of these three factors, Bannum's Technical/Management proposal earned a Green/Acceptable rating. Bannum does not contest the Blue/Very Good ratings it received for the Accountability and Personnel factors. The GAO twice concluded in protest decisions that the BOP properly evaluated Bannum's proposal under the Facility and Programs evaluation factors. AR 1966, 2083–88. The GAO, however, recommended a reevaluation of the Site Location factor, which the BOP reasonably performed. Still, Bannum challenges the minutiae of the agency's evaluation, and calls on this Court to second-guess the discretionary acts of procurement officials, a role this Court will not undertake. See E.W. Bliss Co., 77 F.3d at 449 (1996) ("The evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of the procurement officials, and thus reviewing courts give greatest deference possible to these determinations."). Bannum continues to assert mere disagreement with the BOP's assessment of its proposal. These contentions remain insufficient to persuade the Court that the BOP acted unreasonably. See JWK Int'l Corp. v. United States, 52 Fed.Cl. 650, 660 (2002) (determining that "naked claims" of disagreement with evaluations "no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious").

■ The Court finds that the BOP's judgments concerning the technical merits of each proposal were reasonable. The BOP appropriately evaluated the substance of Bannum's and Dismas' proposals in the context of the RFP's specified criteria, compared the substance of each proposal, and in so doing exercised its judgment with respect to the value and merits of the solutions advanced by each offeror. The BOP determined that Bannum met the minimum requirements of the RFP for the Site Location, Facility, and Programs factors. In contrast, the BOP found Dismas' proposal to "exceed" the RFP's requirements in the Facility and Programs factors. In contesting the agency's conclusions, Bannum does not argue that the BOP violated any law but instead claims that the BOP's exercise of discretion was unreasonable. In weighing Bannum's arguments, the Court is mindful that "[t]he determination of the relative merits of proposals is the responsibility of the procuring agency since it must bear the burden of any difficulties incurred by reason of a defective evaluation." JWK Int'l Corp., 52 Fed.Cl. at 659. Consequently, the Court will not involve itself in evaluating and comparing the technical merits of each proposal. In light of the deference afforded to an agency's technical ratings, this Court will not set aside the BOP's reasonable evaluation of the offerors' proposals.

### 1. The Site Location Factor

■ Bannum contends that, under the GAO's recommended reevaluation, both Dismas and Bannum should have been rated Blue/Very Good under the Site Location evaluation factor. Bannum argues that, since the GAO found both proposals had a "high degree of similarity" and Dismas had received multiple strengths in the first evaluation and Bannum had not, the BOP's reevaluation should have resulted in an upgrade of Bannum's Green/Acceptable rating to Blue/Very Good and no change in Dismas' rating. AR 1960. The BOP did, in fact, decide in its reevaluation to rate each proposal the same. Yet, the reevaluation resulted in each proposal receiving the same lower Green/Acceptable rating, not the higher Blue/Very Good rating

Bannum had wanted. Bannum also apparently assumed that the BOP would reevaluate the proposals under the Site Location factor using the same evaluation panel. Instead, the BOP employed a new panel of evaluators for the reevaluation. AR 1062, 1673. It was entirely reasonable for these new evaluators to assess the proposals differently than the first evaluators and determine that Dismas' rating should be downgraded. Simply because the reevaluation did not turn out as Bannum preferred does not indicate that the BOP acted unreasonably in evaluating the offerors' proposals. Even assuming both had received Blue/Very Good ratings for the Site Location factor as Bannum desired, Dismas' proposal would have had Blue/Very Good ratings in all categories of its Technical/Management proposal and Bannum still would have had two Green/Acceptable ratings in the areas of Programs and Facilities. Therefore, under Bannum's suggested scenario, it still would have been reasonable for the BOP to award the contract to Dismas.

## 2. *The Facility Factor*

██ Bannum also asserts that the BOP's Green/Acceptable rating for the Facility evaluation factor lacks a rational basis. Bannum argues that the BOP erred in assigning its proposed facility floor plan a "weakness" because the "dining and recreation are designated in the same area, and the group meeting room is the same as the visiting room." AR 1720. The BOP, however, had the discretion to identify what it perceived as strengths, weaknesses, and deficiencies of each proposal in compliance with the criteria set forth in the RFP. *See Cube Corp.*, 46 Fed.Cl. at 375. The RFP made clear that any proposed facility must allow for a visiting area with "a reasonable amount of privacy as well as provide for adequate staff supervision." AR 88. In addition, the contractor "shall provide appropriate space and furnishings for private counseling sessions, group meetings, visits and recreation." AR 43. Dismas' proposed facility exceeded the RFP's requirements because it had "additional space for private counseling and group meetings away from living areas, visiting, and dining areas, increasing confidentiality." AR 1719. The BOP evaluated each proposed facility and reasonably concluded that Dismas' floor plan exceeded the RFP's objectives. Despite Bannum's strong disagreement with the Green/Acceptable rating its facility received, Bannum does not argue that Dismas' facility deserved less than a Blue/Very Good rating. Instead, Bannum claims that its facility was equal to the facility proposed by Dismas and that the BOP erred in not evaluating Bannum the same as Dismas. However, if the BOP assigned both Dismas and Bannum the same ratings for each Technical/Management factor, it would not be effectively evaluating each proposal's compliance with the RFP's criteria. Such an approach would eliminate the non-price evaluation factors and provide for an award based only upon price. In fact, the proposals are not the same and the BOP was reasonable to evaluate the strengths and weaknesses and rate each proposal accordingly. Bannum's mere disagreement with the SSEB's findings is insufficient to upset the BOP's judgment.

In addition to evaluating Bannum's floor plan as a "weakness," the BOP discovered that Bannum's facility had many deficiencies, including electrical problems, yet Bannum was reluctant to acknowledge or repair them until after contract award. AR 1719–20. Bannum's reluctance reduced the BOP's "degree of confidence in Bannum's ability to perform the effort if they are awarded the contract." AR 1720. The SSO had the option of assigning a Blue/Very Good rating when an offeror's proposal: (1) meets and exceeds the requirements of the solicitation; (2) shows a very good solution for meeting the needs and objectives of the program; (3) contains one or more significant strengths; and (4) if weaknesses exist they are insignificant and easily correctable. AR 233. Since Bannum's proposal did not meet the criteria specified in the RFP for a Blue/Very Good rating, the BOP reasonably awarded Bannum a Green/Acceptable rating for Site Location. Bannum essentially quibbles with each BOP judgment that resulted in anything less than a Blue/Very Good rating for Bannum. Bannum's objections remain unfounded and lacking support.

### 3. *The Programs Factor*

■ The RFP required each offeror to submit a plan providing a detailed description about the "methods for assessing the individual needs of each offender to assist their reentry into the community, including the assessment instruments used." AR 205. The RFP prescribed that the proposed plan explain the offeror's strategy for assisting offenders with employment, housing, and life skills. *Id.* The offeror also had to describe its ability to network with relevant community resources to offer a comprehensive support structure for the offender. *Id.* The SSEB determined that Bannum's proposal met the RFP's minimum requirements for the Programs factor and assigned it a Green/Acceptable rating. In contrast, Dismas' proposal exceeded the RFP's requirements and it received a Blue/Very Good rating for this factor. Bannum disputes its Green/Acceptable rating but its contentions are without any basis. Again, the BOP exercised its reasonable judgment and, under the highly deferential arbitrary and capricious standard, the Court will not disturb the BOP's actions. *See, e.g., Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955, 959 (Fed.Cir.1993) (citing *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460, (1978) (holding that administrative decisions may not be set aside "simply because the court is unhappy with the result reached.")); *Biospherics, Inc.,* 48 Fed.Cl. at 14; *Cube Corp.,* 46 Fed.Cl. at 385–86.

Again relying upon small details, Bannum articulates several additional reasons why its Programs factor rating is unreasonable and the BOP should have assigned it Significant Strengths. This Court, however, will not second-guess the BOP's judgment by parsing the minutiae of each offeror's plans to determine their degree of similarity. Bannum wants this Court to compare, contrast and evaluate the offerors' Technical/Management proposals but these are not functions of the Court. Once more, Bannum asserts only disagreement with the BOP's assessment and yet again, this fails to establish that the BOP acted unreasonably. Bannum's differing opinion alone does not render the BOP's evaluation unreasonable.

### D. *The BOP's Best Value Determination*

■ Bannum asserts that the BOP conducted an improper "best value" determination because it allegedly erred in evaluating Bannum's Past Performance and Technical/Management proposal. According to Bannum, its proposal is technically equal to Dismas' proposal, and because Bannum offers its services at a lower price, its proposal should have been found the best value to the Government. Bannum's analysis, however, is flawed because the BOP did not find the Technical/Management proposals to be equal. The BOP awarded a higher overall Technical/Management rating of Blue/Very Good to Dismas. Bannum received an overall Technical/Management rating of Green/Acceptable. Each of Bannum's Technical/Management strengths, whether significant or not, was equaled or exceeded by strengths or significant strengths in Dismas' proposal. In addition, Bannum cannot overcome its less than stellar performance in two highly relevant contracts that resulted in its "lower" Blue/Very Good past performance rating.

■ Procurement officials have the discretion to determine which proposal represents the best value for the Government. *E.W. Bliss Co.,* 77 F.3d at 449 (citations omitted). The FAR describes the "best value determination" as a trade-off process: "A trade-off process is appropriate when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror." FAR 15.101–1(a). The Court will not disturb an agency award if the agency officials reasonably and properly exercised their discretion. *See E.W. Bliss Co.,* 77 F.3d at 449. "Mere disagreement with the agency's handling of a procurement matter falls short of meeting the burden of proving that the process was arbitrary and capricious." *Blackwater Lodge & Training Ctr., Inc. v. United States,* 86 Fed.Cl. 488, 514 (2009); *see also ABF Freight Sys., Inc. v. United States,* 55 Fed.Cl. 392, 409 n. 13 (2003) (citation omitted).

In the instant procurement, the SSO properly applied the RFP's stated evaluation criteria to conclude that Dismas' technically superior proposal combined with its better Past Performance rating warranted the payment of a premium in the price. The SSO elaborated on this trade-off process:

As stated in Section M.5 of the Solicitation, Past Performance and Technical/Management combined are significantly more important than Price ... Dismas' Past Performance and Technical/ Management evaluations received Blue/Very Good ratings. Bannum's Past Performance evaluations received a Blue/Very Good rating in Past Performance and received a Green/Acceptable rating in Technical/Management with a Low Risk Level ... Dismas' higher rating and significant strengths listed above, justify paying a premium over the price proposal submitted by Bannum for the potential five-year contract period.

AR 1723. Bannum strongly contends that it is entitled to Blue/Very Good ratings in all Technical/Management categories and an unqualified Blue/Very Good rating for Past Performance. However, Bannum's mere belief that it deserves higher ratings fails to establish that the BOP's assessment was unreasonable, or even flawed. The competition for this procurement was intense. The BOP was forced to examine the proposals closely and make subtle distinctions regarding which offeror would best satisfy the RFP's criteria. As the incumbent, Bannum understandably is disappointed by the loss of the Charleston RRC contract. Nonetheless, the BOP's exercise of discretion was both lawful and reasonable. Accordingly, the Court will not overturn it.

### Conclusion

For the foregoing reasons, Plaintiff's motion for judgment on the Administrative Record is DENIED, and Defendant's and Defendant–Intervenor's cross-motions for judgment on the Administrative Record are GRANTED. The Clerk shall enter judgment for the Defendant. No costs.

On or before December 11, 2009, counsel for the parties shall carefully review this opinion for competition-sensitive, proprietary, confidential, or other protected information and submit to the Court proposed redactions, if any, before the opinion is released for publication. Any proposed redactions must be well supported with an explanation of the specific reasons and authorities for non-disclosure.

IT IS SO ORDERED.